## GREEN v. BANKERS INDEMNITY INS. CO.

Civ. No. 2420.

United States District Court
W. D. Louisiana, Lake Charles Division.

June 8, 1949.

Patin & Patin, of Lake Charles, Louisiana, and Grenese R. Jackson, of Jennings, Louisiana, for plaintiff.

Thos. F. Porter, of Lake Charles, Louisiana, and Thomas L. Raggio, of Lake Charles, Louisiana, for defendant.

## PORTERIE, District Judge.

Mrs. Beatrice Daigle Green has instituted suit for damages, based on tort, against Bankers Indemnity Insurance Company, praying for damages in the amount of $95,498 on behalf of herself and her minor children. Basis for the suit is a public liability insurance policy issued by the defendant to Jeff Walker, doing business as Walker Electric Service.

Suit was initially filed in the Fourteenth Judicial District Court for the state of Louisiana, parish of Jefferson Davis, but on motion of the defendant the suit was removed to this court.

The following facts have been alleged by the plaintiff and were admitted as true in the answer filed by the defendant:

On October 31, 1947, an airplane carrying the pilot and five passengers crashed to the ground while flying near the town of Kinder in Allen parish, Louisiana. As a result of the crash, the pilot and all of the passengers were killed. At the time of this accident, the weather conditions over Kinder were extremely bad and visibility was practically completely cut off to any one flying, due to clouds and other atmospheric conditions. These adverse weather conditions were caused by a "cold front", which was then moving roughly from northwest to southeast and which covered a considerable portion of the country.

The crash occurred when the pilot became unable to direct and control the plane, due to the extreme strain under which the plane was placed by tumultuous air currents resulting from the bad weather. The clouds and moisture-laden air currents extended from quite close to the ground to an extreme height. The pilot of the plane could not see the ground. Being unable to guide his plane through by the use of instruments, he apparently lost all sense of direction, both vertical and horizontal. Due to that circumstance and the force of the air currents, the plane crashed.

It is specifically alleged in the plaintiff's petition that the disastrous crash was caused solely and proximately by the gross negligence and carelessness of the pilot, Floyd G. Walker, in piloting the aircraft directly into a violent storm with an active and turbulent front when he had no knowledge of instrument flying and in strict violation of Civil Aeronautics Administration Regulations. Negligence on the part of the pilot is further alleged in that he neglected to alter his course of flight so as to avoid flying into this violent storm and in neglecting to secure information as to enroute weather prior to his take-off from the Jennings Airport. All of these allegations of negligence are admitted by the defendant; so it is an undisputed fact that the crash which resulted in the deaths of the pilot and passengers was due to the gross negligence and carelessness of the pilot, Floyd G. Walker. It is further alleged and it is admitted by the defendant that the crash would not have occurred if the pilot, Floyd

G. Walker, had not been negligent in his operation of the aircraft.

The alleged reasons for the denial of liability by the defendant are based on the charge that the conditions of the liability policy sued upon were violated in that the negligent conduct of the pilot, Floyd G. Walker, in flying into a violent and turbulent storm, *was with the knowledge and consent of the insured, Jeff Walker*. The policy has been introduced in evidence and it contains in its general conditions certain *stated exclusions* under paragraph numbered six (6).[1]

The negligence of the pilot, Floyd G. Walker, is pleaded by the plaintiff and is admitted by the defendant. But the defendant seeks to escape the liability which normally follows such negligence by pleading that the special conditions of the contract of insurance exclude such a situation from coverage. The defendant specifically pleads that the negligence inherent in the violation of the Civil Aeronautics Regulations was with the knowledge and consent of the insured, Jeff Walker, the father of the pilot and the owner of the aircraft.

We make the following findings of fact.

Jeff Walker, the sole owner of Walker Electric Service, purchased a Beechcraft plane for use in his business and for leassure flying. He himself was not a pilot, but his son, Floyd G. Walker, was a duly licensed and qualified airplane pilot and it was Floyd who piloted the plane whenever Jeff Walker required its use in his business.

On the morning of October 31, 1947, Floyd G. Walker and his wife decided to fly from Jennings, Louisiana, to Kilgore, Texas, to attend the funeral of Mr. Robert G. Green, a relative of the Walker and Green families. The persons who agreed to make this trip with Floyd G. Walker were his wife, Ethel Walker (the daughter of the petitioner, Mrs. Green); the two minor children of Floyd G. Walker and Ethel Walker, namely, Brenda and Sandra;

J. D. Green, the son of the petitioner and the brother of Mrs. Ethel Walker; and, Lawrence Green, the husband of the petitioner and the father of Ethel and J. D. Green.

Floyd G. Walker, his wife, and their two children were driven to the airport by Uda Roy Sonnier, before 9:00 o'clock on the morning of the accident. Lawrence Green and his son, J. D. Green, drove to the flying field with the petitioner, Mrs. Green, and arrived shortly before 9:00 o'clock on the morning of the accident. The airplane was prepared for flight; the pilot and passengers got aboard; and the plane left the Jennings airport at approximately 9:00 o'clock on the morning of October 31, 1947. The route from Jennings, Louisiana, to Kilgore, Texas, required the passage of the plane over the approximate location of Kinder, Louisiana. At that point, extremely adverse weather conditions were encountered and when the pilot attempted to fly through the storm, the crash occurred.

Jeff Walker, the owner of the Beechcraft airplane and the insured, was not at the Jennings airport at the time of the take-off. Earlier in the morning he was at his place of business in Jennings and at about 9:00 o'clock he left for Lake Arthur, Louisiana, to do some work there. The night before, Floyd G. Walker spoke to Jeff Walker about flying to Kilgore, Texas, to attend a funeral and secured Jeff Walker's permission to use the airplane. On the morning of the accident, Floyd G. Walker spent some time at the electric shop helping his father and then left with Uda Roy Sonnier and proceeded to the airport.

Jeff Walker was called as a witness for the defendant and testified that, on the morning in question, the weather appeared to him to be clear—that he observed no clouds nor did he observe any oncoming storm. He testified further that it was not until quite a while after his arrival in Lake Arthur, Louisiana, that he noticed any bad

---

[1] Paragraph 6 (a) of the policy reads in part as follows:

"Exclusions Under the Policy * * * Nor Does This Policy Cover Any Liability in respect to injuries or death or damage caused in whole or in part by the ownership, maintenance or use of any aircraft described in the Schedule of Particulars during or in consequence of:

"(e) Any operation, with the consent of the Insured, * * * in violation of the United States Federal Regulations for Civil Aviation applying to * * * (2) instrument flying * * *"

weather. When he left his shop in Jennings at 9:00 o'clock, the weather was good and clear and when he first observed the onset of bad weather, he thought that by that time Floyd had arrived in Kilgore and made a statement to that effect to another electrician working with him at Lake Arthur.

At no time prior to the onset of actual bad weather in Lake Arthur was Jeff Walker aware that weather conditions and flying conditions were not satisfactory. When he first gave his approval to his son to make the trip, there was nothing to indicate to him that weather conditions would be adverse and such as to require that the pilot be trained in instrument flying. There was no conversation between him and Floyd about this circumstance, there being no apparent necessity for any such conversation. Floyd was the only son of Jeff Walker. Jeff Walker states that had there been any unpleasant weather conditions at the time Floyd left, he would have prohibited and prevented the trip.

Mrs. Green, the plaintiff, drove her husband and her son to the airport and she remained at the field after the plane left. She testified that at that time the weather was clear and the sky was cloudless. She stated that she watched the airplane after its take-off until it reached a point so far distant that it was no longer visible to her and that at no time did the plane become concealed from sight by clouds or any other weather conditions. Mrs. Green has testified that there was nothing apparent to her on the morning in question and at the time of take-off which would have indicated that bad weather was to be expected. She testified that there was no bad weather at Jennings until long after the take-off time and that it was not until 10:00 o'clock in the morning that she noticed adverse conditions. At that time, she telephoned Mrs. Jeff Walker and they concluded that the plane had had sufficient time to have reached Kilgore, Texas, safely.

Uda Roy Sonnier drove Floyd Walker, his wife, and their two children to the Jennings airport. He remained with Mrs. Green at the point of take-off and watched the plane fly out of sight. He testified that at the time the plane left the field weather conditions were good. The sun at that time was shining clearly and the sky was cloudless. Following the take-off he watched the plane until it disappeared in the distance. At no time was the plane obscured or hidden by clouds. The time of take-off was approximately 9:00 o'clock in the morning. It was not until 10:30 in the morning that weather conditions became noticeably bad at Jennings. No storm clouds nor any other indication of any bad weather were visible prior to that time.

From a mass of testimony we have gathered that on that day, what is known as a "cold front", extending many miles from northeast to southwest, advanced in a southeasterly direction across an area covering a large part of the United States. We understand a "cold front" to mean that a mass of cold air advances and on coming in contact with warmer atmosphere causes the warmer air to ascend and the colder air to descend, cold air being naturally heavier than warm air. The turbulence caused by ascending warm air-currents and descending cold air-currents completely agitates all of the surrounding atmosphere and causes criss-crossing air-currents which at times assume enormous speeds. The contact between warm and cold air causes the condensation of moisture, forms clouds and later raindrops to the degree of causing rain. Lightning and thunder follows as a result of the static electricity occasioned by the rushing drops of moisture and the general friction and turbulence of moisture-laden air.

Atmospheric conditions resulting from a "cold front" are such that it is generally unsafe to fly into such turbulence and it is positively unsafe to attempt to fly through any portion of it without training and experience in instrument flying. The clouds resulting from such conditions reduces visibility to the point where one in a plane is unable to see the ground and thus contact flying is at an end.

A Beechcraft plane is a type unfit (too small and too weak) to fly into, or through, thunderheads. It is not supposed to fly with instruments; it is not equipped with the necessary flying instruments. Also, Floyd G. Walker was not trained to do instrument flying.

Other planes were in the air when Floyd G. Walker took off and one or more planes took to the air even after Floyd G. Walker had taken off.

### Discussion.

■ But when did the negligence of Floyd G. Walker occur? Only when it became apparent to Floyd G. Walker that such weather conditions existed. But these conditions were not visible at the time of the take-off. There was negligence in the pilot's failure to investigate en-route weather conditions prior to the take-off. This supports the proof that the weather was so good that no inquiry regarding it was necessary. If the unfavorable flying conditions were not apparent at the time of the take-off, then there was no negligence in flying from the Jennings airfield. When the plane first left the airfield, those interested had no knowledge of what lay ahead.

The violation of the air safety regulations pertaining to instrument flying only occurred when Floyd G. Walker observed the weather conditions and failed to return to his point of take-off and await the passing of the storm. Up to that point, there had been no violations of any air safety regulations. At that point, Floyd G. Walker was far distant from Jennings and from the owner of the plane, Jeff Walker. The insured under the liability policy here involved, Jeff Walker, had no longer any control over Floyd G. Walker and the airplane at the time the violation of the regulations became imminent. When permission to fly was granted by Jeff Walker to Floyd G. Walker, the former did not and could not know that a violation of the air safety regulations pertaining to instrument flying was impending. Without this knowledge, he cannot have consented to such a violation. It was a practical impossibility for him to have given the consent alleged in the answer and all facts and circumstances argue conclusively against such knowledge and consent. The exclusion clause in the instant liability policy never became effective and is not now applicable.

The defense has called witnesses in an attempt to establish that weather conditions at the time of the actual take-off of the Walker plane were such that it was evident that a storm was impending. But a careful consideration of all the evidence offered fails to justify that conclusion.

Probably the strongest witness called by the defense on this point was Harry Langley. Langley was employed by Zigler Flying Service on the date in question. He testified that he was sorry to say that he was no longer employed by them but the reason for the termination of his employment is not given. Langley purported to testify that, "If my memory serves me right, Sir, I believe I could see it [the storm] coming", at the time Walker took off. This is as strong a statement as he could make. His memory may or may not have been serving his right. But the value of Langley's testimony is completely destroyed by his statement that, at the time the Walker plane took to the air, at least two other planes operated by Zigler Flying Service were in the air and did not land until after Walker left the field. Langley further admitted, and this is extremely important, that after Walker took off, at least one and possibly more than one plane took off from the same field. It should be noted particularly that this plane which left after the Walker plane was the one that Langley was engaged in fueling at the time that Floyd G. Walker left. So, some time elapsed, due to the necessity for the completion of the fueling operations, between the Walker take-off and that of the Zigler plane. If other pilots continued to fly after Walker left the Jennings airport, and if still another pilot saw fit to take to flight at a period subsequent to 9:00 o'clock, then weather conditions must not have been bad or unsatisfactory. The contention of the defendant that bad weather was apparent falls.

Another witness called by the defense was Dan Babin, a qualified pilot who flew from the Jennings airfield. Babin testified that he could see clouds building up in the northwest. But Babin was busy piloting his own plane and could not have been very attentive as to the exact time the Walker plane took off. Further, he admits that he continued to fly for at least fifteen minutes after Walker took off and then only landed because he had completed

his mission. He must not have been impressed by the clouds which he saw, otherwise he would not have continued flying for as long as he did. At modern flying speeds a tremendous distance can be covered in fifteen minutes. The Beechcraft "Bonanza" is admittedly a very fast plane. In fifteen minutes, a pilot in an aircraft would have traveled a distance which would permit him to then observe areas which were not at all visible fifteen minutes previously. To one who is not particularly noting the time, the lapse of fifteen minutes is very difficult to estimate. Babin was interested in piloting his own plane and was not interested in the flight of the Walker plane. It is not reasonably safe to conclude whether or not Dan Babin saw the cloud formation at the time of the Walker take-off or fifteen minutes later. Then, too, as we have just stated, the clouds must not have created much of an impression on Babin if we are to judge by his own conduct.

On considering all of the testimony offered, the only reasonable conclusion that we can reach is that at the time Floyd G. Walker took off from the Jennings airport, the weather appeared good, the sky was free from clouds. The storm front then approaching Kinder was not yet visible and did not become visible to Walker until sometime after he was in the air. The expert testimony we have heard concerning this particular type of storm, a "cold front", indicates that it arrives suddenly and almost without warning and that its rate of travel is extremely fast. We know now that there was a storm approaching Kinder when Floyd G. Walker left the airport, but no one at the Jennings airport knew that fact and it did not become known to Walker and his party until they arrived in close proximity to it and then it was too late for Jeff Walker to either approve or disapprove Floyd G. Walker's conduct in violating air safety regulations.

Floyd G. Walker apparently flew only into the outer frontal areas of the storm. This conclusion is strengthened by the testimony of eyewitnesses to the effect that there was no rain and no lightning or thunder at the point of the crash until after the plane struck the ground, so that the full force of the storm had not yet reached Kinder when Floyd G. Walker met his tragic end.

From the facts we have just established, the inescapable conclusion is that the negligent acts of the pilot of the plane *was not with the consent of the insured.*

Condition Six (6), entitled, "Exclusions Under This Policy", under the heading "General Conditions", reads in part as follows:

"Nor Does This Policy Cover Any Liability in respect to injuries or death or damage caused in whole or in part by the ownership, maintenance or use of any aircraft described in the Schedule of Particulars during or in consequence of:—

"a. Any operation, with the consent of the Insured, * * * in violation of the United States Federal Regulations for Civil Aviation applying to * * * (2) instrument flying * * *"

■ The language is very simple:

"Any operation * * * in violation of the United States Federal Regulations for Civil Aviation applying to * * * instrument flying * * *" must be "* * * with the consent of the Insured * * *" for the defendant insurer to be absolved from liability in this case.

From just a common-sense, practical view, the purpose of the taking of this policy by the insured, the owner of the plane, is to be protected from liability in the instant accident. Of course, if he had consented to the operation of the plane in violation of the Regulations applying to instrument flying, then he would not be entitled to recovery; but, under the very clear facts, which show that he did not consent in any way, openly or impliedly, to the flying as was done by the pilot, he has to be protected.

The facts of that fatal morning did not even suggest to the owner that the operation of the plane at the time of take-off would necessitate instrument flying. He had no occasion to even have thought of what actually occurred after the plane took off.

510

### Theory of Defendant.

■ The defendant's position is that Floyd G. Walker, the son of the owner, Jeff Walker, was the particularly named pilot for this plane in the contract. Then the defendant follows with the statement that this was a strong indication of the insured's confidence in the pilot and of his consent for the pilot to operate the plane in his discretion, once the permission for a particular trip is given. The point is made that the trip to Kilgore, Texas, when the plane crashed, was a trip that the owner of the plane knew about and had consented to.

In short, the position of the defendant is that the insurer escapes liability because the pilot had permission to use the aircraft and that the owner of the aircraft had great confidence in his son as a pilot, etc., and that the defendant need not establish consent of the named insured to the violation of regulations pertaining to instrument flying.

With these premises assumed[2], then the defendant attempts to compare the instant contract by analogy to the contract of public liability insurance against damage in Louisiana while an automobile is "being used with the permission of the named insured."

It is an attempt to bring about an analogy of interpretation.

We are directed, for the interpretation of the Louisiana Supreme Court in such automobile liability policies, to the case of Parks v. Hall et al., 1938, 189 La. 849, 181 So. 191 and to the case of Haeuser v. Aetna Casualty & Surety Co. et al., La.App.1939, 187 So. 684.

An analysis of Justice Fournet's opinion in the case of Parks v. Hall, supra, will show that the language in the type of policy under consideration enabled the court to say the following, at page 852 of 189 La., or at page 194 of 181 So.: "We therefore conclude that the *permission of the assured* to Hall *to use the car in the first instance*, irrespective of the use to which he put the car while in his possession, *was 'permission of the assured' within the meaning and contemplation of the 'omnibus clause'* and the insurer is therefore liable to plaintiffs thereunder."

In the Haeuser case, supra, which came subsequently, Judge Westerfield, 187 So. at page 685, said: "The question, therefore, is whether under the omnibus clause the insurer is liable for damages to a third person caused by the automobile of the named insured while operated by a person with the insured's permission, on an errand not con-

---

[2] The examination of Jeff Walker's testimony, however, shows that he said, "I always knew whenever he was taking off. He always told me." The father, in answering the question: "I believe he talked to you about this trip, or told you he was going to make the trip the night before it happened?" gave the following answer: "Yes, sir. He came and told me his nephew * * * had died. In fact, he had been expecting to die for several days and he came and told me he got a message the child was dead and they were planning to go to the funeral and I told him it was all right."

We have also the following colloquy between defendant's lawyer and the father:

"Q. Do you know whether he checked the weather bureau before he flew that day? A. No, sir.

"Q. Don't you know he didn't check it? A. I could not say. I didn't go to the airport. I believe this statement brings it out pretty clearly, Judge. So far as him calling from the shop or to my knowledge—

"Q. I believe you stated you were cer-

tain he did not check the weather? A. I was certain he did not check it from the office."

Then the father to the following question made the following answer:

"Q. Isn't it true, Mr. Walker, that he had your full permission, that is, your son had your full permission to use the plane at all times? A. Yes, sir. He always let me know where he was going. *In other words, I was still the owner of the plane and I had the authority to stop him.* (Emphasis ours).

Then again there are the following questions and answers when the father was cross-examined by the plaintiff's attorney:

"Q. Did Floyd Walker speak to you and get your permission whenever he used the plane? A. Yes, sir.

"Q. Did he discuss it with you, the use of it, each time he used it? A. He would always tell me where he was going.

"Q. Did he ever, to your knowledge, violate any air safety regulations prior to the time of this accident? A. Not that I know of."

templated by or included within the purpose for which permission was given to use the automobile."

At page 687 of the opinion in 187 So., it is clear that the language of this type of policy (automobile liability) clearly indicates that the original consent by the owner for the use of the car would cover by implication a use beyond the permitted use, that is, to the *actual* use though this particular actual use was never in the mind of the owner granting the use. The only qualification is that "provided: it is being used with the permission of the named Assured". No such interpretation is possible in the instant case because the meaning and intendment are crystal clear.

■ In the Hall and Haeuser cases, supra, there entered the point that the language of the policy might have been ambiguous and that any doubt, uncertainty, and ambiguity in the policy language was to be construed against the company. In our instant case, we see no doubt as to the meaning, no uncertainty of language, no possible ambiguity. The phrase "with the consent of the Insured" is immediately between the words, "Any operation" and the words, " * * * in violation of the United States Federal Regulations for Civil Aviation applying to * * * instrument flying * * *"

The phrase is in immediate juxtaposition and it cannot mean merely the consent of the insured to the use of the airplane; it can only mean the consent of the insured to the use of the airplane in violation of the United States Federal Regulations for Civil Aviation applying to instrument flying.

The defendant, after its attempt to develop an exact analogy between the instant contract and that of contracts of automobile liability under the omnibus clause, then makes use of the quotation from 17 C.J.S., Contracts, § 303, page 721, as follows: "Words used in one sense in one part of a contract are as a general rule deemed to have been used in the same sense in another part of the instrument, where there is nothing in the context to indicate otherwise."

■ It is by analogy that the application of this dogma is sought and, firstly, we do not countenance the analogy because the language of the instant contract precludes it. The words "with the permission of the insured", secondly, are not used in the same contract, nor even in the same type of contract.

Our definite view, moreover, is that the theory is totally inapplicable for the reason that we have shown above that there is no doubt or ambiguity in the language of the instant contract.

The Parks and Haeuser cases, supra, involved the interpretation of automobile liacable here because the involved situations bility policies. We consider them inappliare opposite to the one in suit. The question in the automobile cases cited was whether the consent to the use of the motor vehicle was adequate to *impose* liability upon the insurer. In the instant case the question is whether or not the consent was adequate to permit the insurer to *escape* liability.

■ Also, the liberality of interpretation in our Louisiana law, found in the Parks and Haeuser cases, supra, was exercised, not only because the broad language permitted it; but, as Justice Fournet in the Parks case said at page 194 of 181 So.: "The words used in the clause would be practically meaningless and the object there made nugatory if it were necessary to determine in every case whether, at the time and under the circumstances of the accident, the driver was proceeding within the limitations of the permission of the assured to use the car. In order to give the clause 'provided: (a) it is being used with the permission of the named Assured,' the construction placed by the Court of Appeal and contended for by the defendants, we would have to give it a restricted and limited meaning, contrary to the rules of construction of such contracts. We would have to resolve the doubt or uncertainty or ambiguity in favor of the writer of the insurance contract." [3]

The words are certainly not meaningless in the instant case when applied in their

---

[3] Insurance policies in Louisiana are construed against the insurer. The reasons for this rule and the instances when the rule is applied are found in a host of cases collected in La. Digest (1809 to date), Vol. 11, Verbo, "Insurance", ☞ 146(3), pages 134, 135.

direct plain significance. They give vitality to the contract; they give the cause why the insured ever entered into the contract. The insurer, too, may not plead any possible ignorance, in view of the clear language and because of the practical purpose of the provision. It was just the opposite in the necessary interpretation as made finally by the Louisiana courts in the Parks and Haeuser cases, supra.

If our present view were to be overruled, then certainly contracts in the identical language of the instant one would not be entered into anymore. The companies themselves, to get business, would have to prevent this type of bastard interpretation by placing language in their new contracts that could not even tempt one to follow defendant's present theory of interpretation. The legislature would soon prohibit the instant contract, with the view of protection of the innocent public.

Defendant is engaging in a syllogism that leads to the interpretation of a contract so that it perpetrates an injustice on one party to it. Also, it discounts the meaning of one of its plain and practical provisions. It would be an attachment or slavery to form; but an offense to and the destruction of substance.[4]

For the preservation of aviation insurance contracts, we have no other alternative but to interpret the present contract as we do.

We now come to the monetary damages to be allowed to the plaintiff. Under art. 2315 of the Louisiana Revised Civil Code, as amended, two causes of action are given the named beneficiaries in this suit, to wit: (1) the survived action; i. e., the action which the deceased had at the time of death; and the other an action given to the named beneficiaries in their own right for the damages they suffer by reason of the death of their decedent. Eichorn v. New Orleans & C. R. Light & Power Co., 112 La. 236, 36 So. 335, 104 Am.St.Rep. 437; Reed v. Warren, 172 La. 1082, 136 So. 59.

Since Lawrence J. Green, Sr., husband of complainant, and Mrs. Ethel Green Walker, daughter of complainant, and Joseph D. Green, son of complainant, died instantly, the complainant makes no claim for damages under the survived action.

The language of art. 2315 of the Louisiana Revised Civil Code: "The survivors above mentioned may also recover the damages sustained by them * * * as the case may be" is distinctly applicable here. This is the provision of law under which judgment in money damages may be awarded.

The total claim for the widow is $55,498 and the claim she makes as tutrix of her

---

4 We have in mind the following quotation taken from Justice Oliver Wendell Holmes (1936), by Harry C. Shriver, Chapter 1(II), "Science of the Common Law", pp. 9–11, inclusive:

"The little piece of history above, very well illustrates the paradox of form and substance in the development of law. In form its growth is logical. The official theory is that each new decision follows syllogistically from existing precedents. But as precedents survive like the clavicle in the cat, long after the use they once served is at an end, and the reason for them has been forgotten, the result of following them must often be failure and confusion from the merely logical point of view. It is easy for the scholar to show that reasons have been misapprehended and precedents misapplied.

"On the other hand, in substance the growth of the law is legislative. And this in a deeper sense than that which the courts declare to have always been the law is in fact new. It is legislative in its grounds. *The very considerations which the courts most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life.* We mean, of course, considerations of what is expedient for the community concerned. Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to public policy in the last analysis. And as the law is administered by able and experienced men, who know too much to sacrifice good sense to a syllogism, it will be found that when ancient rules maintain themselves in this way, new reasons more fitted to the time have been found for them, and that they gradually receive a new content and at last a new form from the grounds to which they have been transplanted." (Emphasis ours).

three minor children is $40,000; however, the total judgment allowed in this suit under the provisions of the liability policy for any and all purposes is $15,000.

It is unnecessary to arrive and fix the actual monetary quantum to apply in the case; it is sufficient to say that the sum of $15,000 for the total claim is much below the amount actually and legally deserved.

The complaint sets out the usual items of damages; it is not necessary to make a subdivided assessment of awards.

The plaintiff individually is also entitled, under art. 2315 of the Louisiana Revised Civil Code, to a measure of damages suffered by her in the death of her two children in the same accident. We are lumping this amount with the rest.

We shall allow the widow half the amount, or $7,500, as her individual amount, and the sum of $7,500 to her as tutrix of the three minor children: Dorothy Jean, who is aged 14, Loretta, who is aged 8, and Kerry Wayne, who is aged 3. Support by the father of the minors until attainment of majority is provided for by the codal article. Accordingly, the oldest child is entitled for the period of seven (7) years, the other for thirteen (13) years, and the other for eighteen (18) years. The amount of $7,500 in the hands of the tutrix is to be divided in that ratio; the oldest will get 7/38ths, the next 13/38ths, and the third 18/38ths of $7,500; and the judgment should so specify.

Judgment will be signed in accordance with the above opinion upon presentation.