ALBANY INSURANCE CO., et al.,
Plaintiffs–Appellees
Cross–Appellants,

v.

BENGAL MARINE, INC., in personan,
et al., Defendants–Appellants
Cross–Appellees.

No. 87–3391.

United States Court of Appeals,
Fifth Circuit.

Sept. 14, 1988.

Rehearing Denied Oct. 18, 1988.

S. Daniel Meeks, R. Monroe Garner, Abbott, Webb, Best & Meeks, New Orleans, La., for defendants-appellants cross-appellees.

Rufus C. Harris, III, R. Scott Buhrer, Terriberry, Carroll & Yancey, New Orleans, La., for plaintiffs-appellees cross-appellants.

Before RUBIN, GARZA and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In this maritime case we review issues of causation, damages, and insurance policy interpretation pertaining to the sinking of a barge. We AFFIRM the district court's decision on causation and its interpretation of the insurance policy, MODIFY its damages award, and REMAND for further proceedings.

## I.

Newpark Waste Treatment Systems chartered barge R–212 to transport drilling mud from its facility in Morgan City, Louisiana, to Venice, Louisiana. The barge was taken in tow on December 27, 1984 by the BENGAL BRAVE, a tug owned and operated by Bengal Marine. The barge sank on December 30, 1984, while moored in fog-bound weather before it reached its final destination. It was raised on February 20, 1985 and removed to Newpark's Venice facility for cleaning and inspection. The barge was then towed to a facility where it was drydocked and temporarily repaired. A joint survey conducted by representatives of both Newpark and Bengal Marine concluded that permanent repairs would exceed the barge's insured value. The barge was then declared a constructive total loss.

Following a bench trial, the district court "determined that the cause of the R–212's sinking was the incursion of water into the vessel's forward void tanks due to improperly secured manhole covers." The court awarded Newpark's insurers (collectively referred to as "Albany Insurance") damages of $233,955.53, plus interest on the fair market value of the barge ($120,000) from the date of casualty and interest on all other damages from the date of judicial demand. Bengal Marine is now insolvent, and its insurer, Angelina Casualty, was named as a defendant under Louisiana's direct action statute, La.Rev.Stat. § 22:655. Pursuant to terms and conditions of an insurance contract between Bengal Marine and Angelina Casualty the court held that Albany Insurance could not collect on the judgment until all claims covered by the insurance policy were first reduced to a judgment or settlement.

## II.

Lance Hellerman, a naval architect/marine engineer retained by Angelina Casual-

ty, testified that the barge most likely sank because a series of giant waves from a passing boat engulfed it. He based his opinion on the configuration of the barge, the type and weight of the cargo, different possible freeboards, and the speed, horsepower, distance, and wave train of passing vessels. The district court rejected this theory as implausible and adopted the theory proffered by Albany's experts, Shawn Bartnett, a marine surveyor, and William McNeal, a marine consultant and broker. Post-casualty surveys of the barge performed during drydocking indicated that void tanks 1 and 2 had not collapsed or been damaged, but that void tanks 3, 4 and 5 had collapsed inward. Bartnett and McNeal reasoned that these three tanks imploded because their compartments were airtight and their manhole covers properly secured. As the barge sank and pressure increased, air-tight compartments would implode. Because tanks 1 and 2 were not damaged, Bartnett and McNeal suggested that the pressure inside and outside the tank equalized as the barge sank. One logical explanation for pressure equalization was that water had gradually entered tanks 1 and 2 through improperly secured manhole covers throughout the journey.[1]

"In maritime as in most federal actions, the 'clearly erroneous' rule applies to the review of the factual findings of the trial court." *Candies Towing, Co. v. M/V B & C ESERMAN*, 673 F.2d 91, 93 (5th Cir. 1982). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). This case offered the typical "battle of the experts." The experts offered different theories on why the barge sank, discounted the competing theories, were extensively cross-

examined, and were also questioned by the trial judge. The record indicates that the trial judge properly evaluated the veracity of the factual testimony and credibility of two alternative theories and decided, at least in his opinion, that the "improperly secured hatch" theory was more plausible than the "giant wave" theory.

After reviewing the testimony, we have found that neither theory is completely waterproof. In criticizing the conclusions of Bartnett and McNeal, Hellerman calculated that the barge would not sink even if void tanks 1 and 2 had flooded. Yet, his theory was undermined when none of the deckhands could testify that they had heard a vessel pass the barge immediately preceding its sinking. Additionally, as noted by Albany's experts, it would be very unusual for a wave sufficiently large to swamp a barge not to also damage the tug, the dock, or other vessels in the area. Albany's "improperly secured hatch" theory was weakened when deckhands Hebert and Williams testified that they checked the hatches and found them to be tightly secured. The weight of this testimony was reduced, though, when Hebert said he checked the hatches not by opening and reclosing them, but by kicking them. He also admitted that properly secured hatches can become loose. Furthermore, when questioned about one of his inspections, Williams stated: "I ain't going to say I bent down and checked them[.]"

█ We have reviewed the qualifications and testimony of Bartnett, McNeal, and Hellerman, as well as all other testimony relevant to the two competing theories of causation. After doing so, we are not left with a firm and definite conviction that a mistake has been made, and thus we conclude that the district court did not clearly err in accepting the "improperly secured

---

**1.** At oral argument, counsel for Bengal/Angelina argued that the barge sank because Newpark carelessly overloaded it. While some question existed during trial as to the exact weight of the cargo, Bengal/Angelina did not seriously argue to the court that the barge sank because it was overloaded. Thus whether this theory is plausible is not before us. Furthermore, this theory seems inconsistent with two undisputed findings: the barge was riding well above water level during at least part of its journey (suggesting that the barge was not overloaded) and the barge was not listing (which would have occurred had the excess liquid cargo sloshed from side to side).

hatch" theory and rejecting the "giant wave" theory.[2]

## III.

■ Angelina next contends that the district court erred in awarding total damages of $233,955.53 when the fair market value of the barge was only $120,000 and the salvage value was only $5,000. Damages need not be proven with an exact degree of specificity, and we review the award under the clearly erroneous standard. *Mitsui O.S.K. Lines, K.K. v. Horton & Horton, Inc.*, 480 F.2d 1104, 1106 (5th Cir.1973). "It suffices if a state of facts is shown from which a court or jury can find with reasonable certainty that the damages claimed were actually or may be reasonably inferred to have been incurred[.]" *Id.*

■ Bartnett testified that excess expenses were necessarily incurred in cleaning the oily residue from the barge's cargo hopper. Until the barge was cleaned, no shipyard or scrapyard would accept it, and the uncleaned barge could not be abandoned where it lay without violating environmental and Coast Guard rules. Additionally, the barge could not pass through certain locks until temporary repairs were made that would keep the barge afloat absent the operation of pumping equipment. This testimony is plausible and precludes us from decreasing the award merely because of the large discrepancy between damages, fair market value, and salvage value.

■ Angelina argues that the district court should have disallowed fleeting charges of $1,050 because Newpark could have fleeted the barge free of charge at its Venice facility. As noted by Albany Insurance, however, Newpark could have in-

curred expenses exceeding $1,050 in towing the barge to Venice.

■ Angelina contends that the district court erred in awarding $15,202.50[3] for the rental of replacement barge WGH-77. The generally established rule is that in a case of total loss the measure of damages does not include loss of use or other consequential damages. *King Fisher Marine Service, Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1186-87 and n. 2 (5th Cir.1984); *A & S Transportation Co. v. Tug Fajardo*, 688 F.2d 1, 2-3 (1st Cir.1982). Albany Insurance offers no reason why we should not follow the general rule. We therefore hold that the district court erred as a matter of law in awarding replacement damages of $15,202.50.

■ Angelina next argues that the district court clearly erred in awarding damages of $8,068.20 for salaries and expenses of Newpark's personnel and equipment. Angelina contends that the record is devoid of any evidence establishing that Newpark incurred such costs. We are unsure what type of evidence Angelina desires, but the record contains nine invoices from Newpark totalling $8,068.20 which describe in detail such information as "problem description", "work performed", and costs. Our review has not revealed that Newpark requested reimbursement for anything except reasonably incurred expenses.

■ Finally, Angelina contests the district court's award of prejudgment interest on damages other than those representing the value of the barge because they had a genuine dispute in the instant case. Their reliance on *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026 (5th Cir.1986), is misplaced. There we wrote:

> Under maritime law, the awarding of prejudgment interest is the rule rather

---

**2.** Bengal Marine also argues that the district court erred in placing the burden of proof on it under "the *Pennsylvania* Rule", THE PENNSYLVANIA, 86 U.S. (19 Wallace) 125, 136 (1873), because the crew of the BENGAL BRAVE allegedly violated certain navigation statutes. Even if the trial court erroneously applied "the *Pennsylvania* Rule," however, we need not remand for a new trial because the principal theory for sinking adopted by the trial court did not rest

on the alleged violations. Therefore, we have independent grounds for affirming the causation issue even if "the *Pennsylvania* Rule" was incorrectly applied.

**3.** This amount represents the sum of items 6, 7, 16, 26, 27, and 33 on the summary of charges (Plaintiff's exhibit # 3).

than the exception, and, in practice, is well-nigh automatic. A trial court has the discretion to deny prejudgment interest only where peculiar circumstances would make such an award inequitable. Peculiar circumstances may be found where plaintiff improperly delayed resolution of the action, where a genuine dispute over a good faith claim exists in a mutual fault setting, where some equitable doctrine cautions against the award, or where the damages award was substantially less than the amount claimed by plaintiff.

*Id.* at 1028 (citations omitted). As in *Reeled Tubing*, this is neither a mutual fault case, nor does there exist any more evidence of a "good faith" dispute here than in any other nonfrivolous admiralty suit. *Id.* at 1029. Therefore, the trial court did not err in awarding prejudgment interest on the entire damage award.

## IV.

Angelina Casualty and Albany Insurance both argue that the district court erroneously interpreted the insurance policy between Angelina Casualty and Bengal Marine. Neither party disputes the trial court's finding that the policy was one for protection and indemnification. The dispute concerns the interpretation of the following provision:

### ANNUAL AGGREGATE DEDUCTIBLE

In consideration of the premium charged, it is hereby understood and agreed that the named assured shall bear a maximum of $200,000 in the aggregate of valid claims for each annual period covered hereunder in excess of the applicable basic deductible(s) as specified.

Claims after the exhaustion of the Annual Aggregate Deductible of $200,000 shall be paid in full by Underwriters as if this endorsement did not exist, but always subject to the applicable basic deductible(s).

Only amounts paid by the Named Assured shall be eligible to reduce the aggregate deductible. Reserved or Estimated losses are not eligible.

Underwriters rights in respect to settlement of any claims or potential claims hereunder shall not be affected by this clause.

This clause shall only apply to claims occurring after 12:01 a.m. of the first day following the calendar month in which net pay and estimated claims to underwriters exceed $220,000.

Read in conjunction with other provisions, the above provision requires Bengal Marine to pay an initial $10,000 per occurrence, after which Angelina Casualty is responsible for the next $220,000 in aggregate claims. Thereafter, Bengal Marine is responsible for a "mid-level annual aggregate deductible" of $200,000, after which Angelina Casualty bears responsibility for claims up to a per occurrence limit of $1,000,000. Neither party disputes the basic mechanics of this provision, nor the fact that Angelina Casualty had satisfied its responsibility for aggregate claims of $220,000 by March 1986. Because Bengal Marine is insolvent and has not paid its mid-level annual aggregate deductible, Angelina Casualty contends that it is not yet liable for any damages assessed herein, whereas Albany Insurance argues that the provision is inapplicable to its claim.

Albany Insurance's argument rests on the allegedly ambiguous nature of the word "claim" in the last paragraph of the above provision. It contends that its "claim" arose when the barge sank in December 1984. Because its "claim" arose prior to March 1986, the date by which Angelina Casualty had paid aggregate claims of $220,000, the provision ostensibly affords Angelina Casualty no protection from responsibility. Albany Insurance also argues that the ambiguity should be construed against Angelina Casualty as the drafting party.

Although the policy does not define "claim," the following policy provisions demonstrate that "claim" does not mean the same thing as "accident," "incident," or "occurrence," as argued by Albany Insurance, but instead represents an obligation mutually agreed upon or legally imposed:

In the event of any accident or occurrence which could give rise to a claim ...

\* \* \* \* \* \*

No liability shall exist ... until the fact and amount of [Bengal Marine's] obligation to pay shall have been finally determined either by judgment against [Bengal Marine] after actual trial or by written agreement....

\* \* \* \* \* \*

No action shall be against [Angelina Casualty] to recover for any loss under this policy until the amount of the damage for which [Bengal Marine] is liable is determined, either by a final judgment ... or by agreement....

Furthermore, any ambiguity would be resolved against Bengal Marine and not Angelina Casualty, for the record indicates that Michael Brown, Bengal Marine's agent, drafted the last paragraph of the provision here at issue.

■ Angelina Casualty argues that it is not liable for any damages assessed in this case because it has already satisfied its initial obligation to pay $220,000 in other, earlier claims against Bengal Marine and Bengal has yet to pay its mid-level annual aggregate deductible of $200,000. The trial court disagreed.

To so hold would permit Angelina, the insurer, to escape its upper level liability to claimants under this Policy, simply because Bengal, its insured, is in bankruptcy. The Court, therefore, holds that all claims that are pending under this policy must be reduced to judgment (as in this case) or settled, and then aggregated. Thereafter, the initial deductible that is applicable to each claim must be calculated so that the $200,000.00 deduction is applied proportionately to all the claims. This case will unfortunately not end at this point. Plaintiff must ensure that the above mentioned events take place before he will be able to realize any damages. Each claimant will then be required to reduce his recovery (in the $200,000.00) in such proportion as his claim bears to the total claims. Angelina would then be required to pay any remaining sum up to $1,000,000.00 on all liquidated claims.

We agree with the district court that Angelina should not be allowed to escape its obligations under the insurance policy simply because its insured is in bankruptcy.

Our analysis begins by recognizing that the insurance policy between Bengal Marine and Angelina Casualty, although characterized as an indemnity policy by Angelina, is governed by Louisiana's Direct Action Statute, La.Rev.Stat.Ann. § 22:655. *Cushing v. Maryland Cas. Co.*, 198 F.2d 536 (5th Cir.1952); *Continental Oil Co. v. Bonanza Corp.*, 677 F.2d 455, 460 (5th Cir.1982); *Olympic Towing Corporation v. Nebel Towing Corporation*, 419 F.2d 230 (5th Cir.1969), *cert. denied*, 379 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396, *overruled on other grounds, Crown Zellerbach Corp. v. Ingram Industries, Inc.*, 783 F.2d 1296 (1986). *See also,* La.Rev.Stat. Ann. § 22:6(4) (liability insurance as defined in § 655 includes "... insurance against the liability of insured for damage to or destruction of another person's property.").

The direct action statute is constructively incorporated into every insurance policy having effect in Louisiana. *Humble Oil & Refining Co. v. M/V John E. Coon*, 207 F.Supp. 45 (E.D.La.1962). This statute provides that "the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for injuries sustained or loss occasioned during the existence of the policy...." Thus, through the direct action statute, Louisiana has afforded claimants a direct cause of action against insurers precisely so that claimants can collect despite the insolvency of the insured. If claimants had to wait for the insured to pay its deductible or pay the claim before the insurer would satisfy their claim, they would effectively be barred from ever collecting from insurers of bankrupts.

Furthermore, this Court has previously held that an insured's failure to pay on a claim as required by the policy as a condition precedent to the insurer's payment to the insured, does not preclude a direct ac-

tion. *Olympic Towing Corporation v. Nebel Towing Corporation,* 419 F.2d 230 (5th Cir.1969), *cert. denied,* 379 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396, *overruled on other grounds, Crown Zellerbach Corp. v. Ingram Industries, Inc.,* 783 F.2d 1296 (1986).

Louisiana's direct action statute does, however, limit the amount that claimants can recover from insurers to amounts which the insurer is liable "within the terms and limits of the policy." La.Rev. Stat.Ann. § 22:655. The parties agreed that Bengal would be responsible for the next $200,000 after Angelina had paid $220,000 in aggregate claims against Bengal for the policy year ending in September 1985. To apply the entire deductible to Albany's judgment would unfairly discriminate against it in favor of other parties whose claims, referenced in the trial record, remain outstanding.

 To address this potential inequity, the district court ordered that the mid-level annual aggregate deductible be applied proportionately to all the claims still outstanding against the policy so that Albany will share the burden of the deductible with other claimants. In so doing, the district court did not abuse its discretion. Such a pro rata reduction of claims has often been used by courts to equitably apportion the monetary burden where the total amount of awards among a group of successful claimants exceeds the limits of the insurance policy. *See Sutton Mutual Ins. Co. v. Rolph,* 244 A.2d 186 (N.H.Sup.Ct.1968); *Burchfield v. Bevans,* 242 F.2d 239 (10th Cir.1957); *Parker v. Travelers Ins. Co.,* 369 So.2d 1120 (La.Ct.App.1979); *Wondrowitz v. Swenson,* 392 N.W.2d 449 (Wis. Ct.App.1986). This Court has previously upheld a proportional distribution of inadequate insurance proceeds by the district court. *Green v. Bankers Indemnity,* 84 F.Supp. 504 (W.D.La.1949), *aff'd,* 181 F.2d 1. We perceive no meaningful difference between those cases, which apportioned policy proceeds, and this one, which will apportion the policy deductible.

Consequently, after all claims pending under the policy as of this date are reduced to judgment or settled, the district court shall enter judgment for Albany based on the damages here affirmed, reduced by the proportionate share of the $200,000 mid-level annual aggregate deductible which its damages bear to the other non-pending claims.

### V.

In summary, for the reasons set forth above we affirm the district court's finding on causation and its judgment regarding the interpretation of the insurance policy, modify its damage award, and remand for further proceedings consistent herewith.

AFFIRMED IN PART, MODIFIED IN PART, and REMANDED.