**TOWN OF CUMBERLAND**

v.

**RHODE ISLAND INTERLOCAL RISK MANAGEMENT TRUST, INC. et al.**

No. 2002–2–Appeal.

Supreme Court of Rhode Island.

Nov. 24, 2004.

Daniel V. McKinnon, Pawtucket, for Plaintiff.

Sheldon Whitehouse, Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, and SUTTELL, JJ.

## OPINION

GOLDBERG, Justice.

This case came before the Supreme Court on September 29, 2004, on appeal from a grant of summary judgment in favor of the plaintiff, Town of Cumberland (town or plaintiff). The defendants, Rhode Island Interlocal Risk Management Trust, Inc. (Trust), Coregis Indemnity Company (Coregis), and Underwriters at Lloyd's, London (Underwriters or, collectively, defendants),[1] challenge the findings of the trial justice that the town is entitled to indemnification for payments made in settlement of an underlying lawsuit alleging civil rights violations. For the reasons herein, we deny and dismiss the appeal and affirm the judgment of the Superior Court.

### Facts and Travel[2]

This insurance coverage dispute arose out of plaintiff's payment of a $1.6 million settlement to Richard and G. Robert Savage (Savages) and L.A. Ray Realty (collectively, underlying claimants)[3] for damages resulting from a course of conduct that can best be described as a dark chapter in the history of the Town of Cumberland. The

1. The Trust is a risk-sharing pool of which the town is a member-owner. At all relevant times, the town was covered by a Trust-managed self-insurance retention of $250,000 as well as additional insurance policies carried through the Trust and provided by Underwriters and Coregis, as successor in liability to International Surplus Lines Insurance Company.

2. The facts reported herein have been adopted from our opinion in *L.A. Ray Realty v. Town Council of Cumberland*, 698 A.2d 202 (R.I.1997) (*L.A. Ray Realty II*) (holding town liable for civil rights violations against plain-

tiffs), and the decisions of the Superior Court in *Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.*, C.A. 99–23, 2000 WL 1472707, Sept. 28, 2000 (declaring town entitled to indemnification from defendants), and *L.A. Ray Realty v. Town Council of Cumberland*, C.A. 89–449, 1994 WL 931001, Nov. 30, 1994 (finding town tortiously interfered with plaintiffs' prospective economic advantage).

3. Richard and G. Robert Savage are the successors in interest to Savage Bros., Inc., one of the plaintiffs in the original litigation.

plaintiff filed this action seeking a declaration that defendants were obligated to indemnify the town for the settlement amount; the town alleged breach of contract and insurer bad faith.[4] The defendants sought a declaration that insurance coverage was not available because the conduct giving rise to the underlying litigation was outside the scope of coverage. An understanding of the history behind the town's settlement with the underlying claimants is necessary for our discussion. Thus, we have set forth those unfortunate events as follows.

On September 28, 1987, the town planning board (planning board) adopted new subdivision regulations establishing minimum-lot-size requirements. The underlying claimants previously had filed subdivision applications with the town that, by virtue of a "grandfather's rights clause,"[5] would not be subject to the new regulations. On October 7, 1987, the town council amended the town zoning ordinance to reflect the new regulations, specifically exempting subdivision applications submitted before September 28, 1987, from the minimum-lot-size requirement.

In 1988, the town council considered two subsequent proposals to increase the minimum-lot-size requirement. The town council held public hearings, at which the underlying claimants appeared and opposed the measures; thereafter, both proposals were defeated. A town resident then took up the cause, circulating a petition for a referendum question on the November 1988 ballot to change the lot size requirement for all but previously recorded lots of record. On September 8, 1988, the town solicitor wrote to the Secretary of State asking that the issue be put on the November ballot. The town solicitor's letter included the zoning ordinance text as it would read if the citizens of the town approved the referendum question, including a savings clause that exempted all subdivision applications submitted before September 28, 1987. The townspeople approved the referendum question on November 8, 1988. On January 18, 1989, the town council amended the zoning ordinance, adding the new minimum acreage requirement but intentionally omitting the savings clause.[6]

On November 21, 1988, without adequate notice to the underlying claimants and despite compliance with all other regulations, the planning board summarily denied certain of their subdivision applications for noncompliance with the newly enacted minimum-lot-size ordinance. The underlying claimants sought a writ of mandamus in the Superior Court to compel the planning board to conduct hearings on their applications. The trial justice found that the underlying claimants were entitled to detrimental-reliance hearings and ordered the planning board to proceed accordingly. On July 17, 1989, the planning board, after hearings, again denied the subdivision applications. After an unsuccessful appeal to the town zoning board, the underlying claimants appealed to the Superior Court.

Meanwhile, the underlying claimants had filed a second complaint in the Superior Court challenging the validity of the

---

4. The bad faith claim is pending in the Superior Court, awaiting resolution of this appeal.

5. The clause provided:
 "[T]hose applications that have been submitted for subdivisions as of the date of passage of these Regulations will be permitted to continue under the Regulations in effect prior to adoption of these Regulations."

6. The amendment was effective as of November 16, 1988, the date the canvassing board certified the referendum vote.

zoning ordinance amendment. On appeal, this Court invalidated the zoning ordinance amendment because the initiative or referendum process did not comply with the procedural safeguards required for adoption or amendment of subdivision regulations and zoning ordinances. *L.A. Ray Realty v. Town Council of Cumberland,* 603 A.2d 311, 315 (R.I.1992) (*L.A. Ray Realty I*). Our decision in *L.A. Ray Realty I* mooted the underlying claimants' appeal of the town zoning board's decision, prompting them to amend their complaint to allege substantive and procedural due process violations and intentional interference with prospective economic advantage.

The trial justice found that the town did not deprive the underlying claimants of any due process rights but that it did tortiously interfere with their prospective economic advantage, inviting the parties to submit briefs on causation and damages.[7] On June 26, 1995, the trial justice found that the underlying claimants had suffered damages amounting to $1,094,742.81. However, under the Governmental Tort Liability Act, G.L. 1956 chapter 31 of title 9, recovery was limited to $100,000 per claimant. On appeal, in *L.A. Ray Realty v. Town Council of Cumberland,* 698 A.2d 202 (R.I.1997) (*L.A. Ray Realty II*), this Court held that, in addition to intentionally interfering with the underlying claimants' prospective economic advantage, the town violated their substantive and procedural due process rights. Further, we concluded that the underlying claimants were entitled to recover the full amount of their damages under 42 U.S.C. § 1983.

On remand to the Superior Court for a determination of the proper amount of damages,[8] the town settled with the underlying claimants for approximately $1.6 million and sought indemnification from defendants. The defendants' denial of the town's indemnification claim prompted this lawsuit.

The town filed a complaint alleging breach of contract and seeking a declaratory judgment that it was entitled to indemnification for the amount paid to settle the underlying lawsuit. The town moved for summary judgment, asserting that its insurance policies afforded coverage for civil rights violations and, therefore, defendants were obligated to indemnify it as a matter of law. The defendants also moved for summary judgment, countering that the intentional, illegal, and fraudulent nature of the town's actions precluded coverage under the terms of the policies and, further, recovery for the conduct would contravene Rhode Island public policy. Additionally, defendants argued that the town's denial of the underlying claimants' subdivision applications amounted to a constructive taking and such takings were specifically excluded from the town's coverage.

The motion justice granted summary judgment for the town finding that the town was entitled to indemnification under the Trust policy because coverage for civil rights violations was explicitly included. Neither the exclusion for fraudulent actions found in the errors and omissions clause, nor Rhode Island public policy, precluded coverage under the general liability

---

**7.** *L.A. Ray Realty v. Town Council of Cumberland,* C.A. 89–449, 1994 WL 931001, Nov. 30, 1994.

**8.** With respect to the damages for interference with the underlying claimants' prospective economic advantage, we instructed the Superior Court to adjust L.A. Ray Realty's award to account for its continued ownership of the land in question and to determine, *inter alia,* whether and how much the underlying claimants should receive in prejudgment interest and attorney's fees.

policy.[9] Furthermore, the motion justice found that the exclusion for payments arising out of condemnation of land was inapplicable. The defendants appeal from the judgment of the Superior Court.[10]

On appeal, defendants jointly raise three issues for our review. The defendants challenge the motion justice's finding that the general liability policy provides coverage for personal injuries that are intentional or expected. Further, defendants contest the motion justice's finding that Rhode Island public policy does not prohibit the payment of insurance benefits for damages intentionally caused by the insured. Lastly, defendants assert that the motion justice erred in finding that the town's claim was not barred by the exclusion for claims "in any way connected with * * * condemnation" of property.

In addition, defendant Coregis separately raises four issues pertaining to provisions of its excess liability policy that differ from the Trust policy. The motion justice did not reach Coregis's separate claims in his decision. Coregis asserts that both its inverse condemnation exclusion and its expected or intended liability exclusion apply to these facts and bar recovery. Apparently classifying the underlying claimants' injuries as property damage, Coregis further contends that claims for diminution of value do not qualify as property damage under the excess liability policy. Finally, Coregis argues that its public officials liability exclusion precludes coverage for the town's claim.

### Standard of Review

"It is well settled that this Court reviews the granting of a summary judgment motion on a *de novo* basis." *M & B Realty, Inc. v. Duval*, 767 A.2d 60, 63 (R.I.2001) (citing *Marr Scaffolding Co. v. Fairground Forms, Inc.*, 682 A.2d 455, 457 (R.I.1996)). The same standards applicable to the trial justice govern our review. *Id.* (citing *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I.1996)). "Accordingly, we will affirm a summary judgment if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Rotelli*, 686 A.2d at 93 (citing *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I.1996) and *Providence Journal Co. v. Sundlun*, 616 A.2d 1131, 1133 (R.I.1992)).

### Coverage for Personal Injuries under the General Liability Clause

The defendants assert that the motion justice erred in finding that the general liability policy covers intended or expected personal injuries. The basis for defendants' assignment of error is that the general liability policy limits coverage to personal injuries and property damage resulting from "occurrences," which, by definition, must be unexpected or unintended. The defendants argue that, because the acts giving rise to the settlement paid by the town were not unexpected or unintended, the town is not entitled to indemnification.

The defendants' assertion is based on the following language from Section II, Agreement C of the casualty insurance section of the policy:

---

9. The defendants do not appeal the motion justice's finding that the errors and omissions clause did not operate to preclude coverage under the general liability policy.

10. Underwriters filed its notice of appeal on November 8, 2001; Coregis and the Trust filed separate notices of appeal on November 21, 2001. Judgment was entered by the motion justice on August 5, 2003, *nunc pro tunc* to November 7, 2001.

"GENERAL LIABILITY: Underwriters hereby agree, subject to the limitations, terms and conditions hereunder mentioned, to indemnify [town] for all sums which [town] shall be obligated to pay by reason of the liability imposed upon [town] by law or assumed by [town] under contract or agreement, for damages direct or consequential, and expenses, all as more fully defined by the term 'Ultimate Net Loss', on account of *personal injuries,* including death at any time resulting therefrom, suffered or alleged to have been suffered by any person or persons (excepting employees of [town] injured in the course of their employment); *and/or damage to or destruction of property or the loss of use thereof arising out of any occurrence* happening during the period of Insurance." (Emphases added.)

The motion justice found that the use of a semicolon separating the definitions of liability for personal injuries and that of property damages created two independent clauses and that the term "arising out of any occurrence" was limited to property damage. Consequently, he determined that the appearance of the term "occurrence" after the semicolon meant that it modified property damage, but not personal injuries.

Setting aside the grammatical analysis, the motion justice further found that the policy could not be read to cover only personal injuries arising from "occurrences" because the policy's definition of personal injuries explicitly includes several intentional torts. Under the policy, personal injuries include "False Arrest, False Imprisonment, Wrongful Eviction, Detention, Malicious Prosecution, Discrimination, Humiliation, Invasion of Rights of Privacy, Libel, Slander or Defamation of Character; also * * * *Violation of Civil Rights,* Assault and Battery, and Disparagment [*sic*] of Property." (Emphasis added.) The motion justice found that, at best, the general liability clause is ambiguous and should be construed in favor of the town.

■ This Court interprets the terms of an insurance policy according to the same rules of construction governing contracts. *Pawtucket Mutual Insurance Co. v. Gay,* 786 A.2d 383, 386 (R.I.2001) (citing *Textron, Inc. v. Aetna Casualty & Surety Co.,* 638 A.2d 537, 539 (R.I.1994)). We look at the four corners of a policy, viewing it "in its entirety, affording its terms their 'plain, ordinary and usual meaning.'" *Casco Indemnity Co. v. Gonsalves,* 839 A.2d 546, 548 (R.I.2004) (quoting *American Commerce Insurance Co. v. Porto,* 811 A.2d 1185, 1192 (R.I.2002)). "The test to be applied is not what the insurer intended by his words, but what the ordinary reader and purchaser would have understood them to mean." *Pressman v. Aetna Casualty and Surety Co.,* 574 A.2d 757, 760 (R.I.1990) (quoting *Elliott Leases Cars, Inc. v. Quigley,* 118 R.I. 321, 326, 373 A.2d 810, 812 (1977)).

■ We will not deviate from the literal policy language unless we deem the policy to be ambiguous. *Pawtucket Mutual Insurance Co.,* 786 A.2d at 386 (citing *Sjogren v. Metropolitan Property & Casualty Insurance Co.,* 703 A.2d 608, 610 (R.I. 1997)). We will not indulge in "'mental gymnastics * * * to read ambiguity into a policy where none is present.' * * * If, however, a policy's terms are ambiguous or capable of more than one reasonable meaning, the policy will be strictly construed in favor of the insured and against the insurer." *Id.* (quoting *Sjogren,* 703 A.2d at 610).

The defendants argue that when construing the insurance contract, the motion justice placed undue importance on the use of the semicolon and failed to interpret the

clause in light of the entire insurance contract.[11] They assert that the use of the phrase "Ultimate Net Loss" in the general liability section of the policy provides additional evidence of the requirement that personal injuries arise out of an occurrence because "Ultimate Net Loss" is defined as "the total sum which [town] becomes obligated to pay by reason of *personal injury or property damage claims * * * which are paid as a consequence of any occurrence* covered hereunder." (Emphases added.) Furthermore, defendants argue, the term "personal injuries" is incorporated into the definition of "occurrence:"

> "OCCURRENCE—The term 'occurrence' wherever used herein shall mean *an accident or a happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, or damage to property* during the policy period. All such exposure to substantially the same general conditions existing at or emanating from one location shall be deemed one occurrence." (Emphasis added.)

 Reading the policy in its entirety, it is evident that the occurrence requirement is more akin to damages arising from negligence and cannot be applied to claims for personal injuries because to do so would yield the absurd result of a policy that covers unexpected and unintended intentional torts.[12] As the motion justice noted, false arrest, false imprisonment, malicious prosecution, and assault and battery, all of which are listed in the policy as potential personal injuries, "can never arise out of an 'occurrence,' as defined in the insurance contract, because they all either require the element of intent or require an element of expectation as to the resulting injury." The defendants contend that the policy is not ambiguous or illusory, drawing a distinction between tortfeasors who act intending to harm and those who act intending only to commit the tortious act, but not intending to harm. This is a distinction without a difference. We would be hard-pressed to distinguish the pummeling inflicted on the underlying claimants in this case and damages arising from violent police brutality. Civil rights violations, by their nature, are discriminatory acts committed in violation of the United States Constitution.

---

**11.** As defendants point out, in addition to separating clauses of a compound sentence, a semicolon can be used to separate listed elements that contain commas. Random House Unabridged Dictionary 1741 (2d ed. 1993).

**12.** Our analysis of this issue is not unique; several other jurisdictions are in accord with our treatment of the ambiguity inherent in an occurrence policy that covers intentional torts. *See, e.g., North Bank v. Cincinnati Insurance Companies*, 125 F.3d 983, 986 (6th Cir.1997) ("We reject the defendant's argument that the policy covers only unintentional torts because of the ambiguity created when the policy is read as a whole. * * * '[T]he definition of personal injury which includes intentional torts and the definition of "occurrence" which excludes intentional torts' are inconsistent and create an ambiguity."); *Imperial Casualty and Indemnity Co. v. State*, 246 Conn. 313, 714 A.2d 1230, 1237 (1998) ("Although by defining an occurrence as 'an accident' the policy attempts to limit coverage to conduct that is unintentional, this definition * * * gives rise to an internal inconsistency. * * * The result is that the policy purports to provide coverage for accidental, intentional torts—torts that, of course, do not exist."); *Missouri Property and Casualty Insurance Guaranty Association v. Petrolite Corp.*, 918 S.W.2d 869, 872 (Mo.Ct.App.1996) ("In this case, [the policy] offers coverage for age discrimination and other intentional torts through the definition of 'personal injury' but denies any coverage for those claims in its definition of 'occurrence' by requiring that the act be unexpected and unintentional. When a contract promises something in one place and takes it away at another place an ambiguity exists.").

The defendants rely on *Peerless Insurance Co. v. Viegas*, 667 A.2d 785, 787–89 (R.I.1995), in which this Court held that an insurance company was not required to defend an insured in a suit seeking damages for alleged sexual molestation of a child because the policy precluded coverage for personal injuries "expected or intended by the insured." This Court rejected a blind application of the pleadings test to determine whether the insurer was obligated to defend the insured, holding that intent to cause harm is inferred in cases of sexual molestation of a minor. *Id.* In *Peerless*, the homeowner's insurance policy did not explicitly provide coverage for damages arising from the sexual molestation of a child. *Id.* at 787. Furthermore, an ordinary purchaser of homeowner's insurance would not reasonably expect his/her policy to provide such coverage.

Clearly, this case is distinguishable from *Peerless*. The claim at issue is markedly different from a homeowner's policy claim for damages arising from a criminal act, the sexual assault of a child. We are satisfied that municipalities purchase insurance with the reasonable expectation that it will protect the municipal treasury from liability for intentional torts committed by the town's agents and employees. Furthermore, it is unlikely that an ordinary buyer of this insurance who reads the policy at issue would draw a distinction between intentional and unintentional forms of the covered torts, but probably would assume, by the definition of personal injury, that there would be full coverage for all the torts listed in the policy. Most significantly, in light of our holding in *L.A. Ray Realty II*, it cannot be disputed that the underlying claim is for civil rights violations, which are explicitly covered under the policy definition of general liability coverage.

We agree with the motion justice that the policy's definitions of "personal injuries" and "occurrences" are contradictory and create an ambiguity, which must be construed against the defendants and in favor of coverage. Neither the inclusion of the term "Ultimate Net Loss" in the general liability clause nor the use of the term "personal injury" in the definition of "occurrence" alters this result but, rather, serves to highlight the ambiguity. We conclude that the policy must be read to provide coverage for the intentional torts listed in the "personal injuries" definition, including the tort at issue, a civil rights violation.

## Rhode Island Public Policy

█ The motion justice found that Rhode Island public policy did not bar the town's recovery for the malfeasance of its officials. The defendants assert that the motion justice erred by narrowly construing the cases on point, ignoring the fortuity principle, and rejecting precedent from other jurisdictions.

The defendants contend that insureds should not be allowed to recover for damages resulting from intentional acts because they are non-fortuitous losses. The defendants argue that insurance companies can only manage risk of fortuitous events and an insured's intentional acts are non-fortuitous.[13] The defendants rely on *Koppers Co. v. Aetna Casualty and Surety Co.*, 98 F.3d 1440, 1447 (3d Cir. 1996), which applies the fortuity principle,

---

**13.** *See Farmers and Mechanics Mutual Insurance Co. of West Virginia v. Cook*, 210 W.Va. 394, 557 S.E.2d 801, 810 (2001) (An intentional acts exclusion in an insurance policy "prevents individuals from 'purchasing insur-

ance as a shield for their *anticipated intentional misconduct*. Without such an exclusion, an insurance company's risk would be incalculable.' ").

noting that this Court cited *Koppers* with approval in *Insurance Co. of North America v. Kayser–Roth Corp.,* 770 A.2d 403, 413–14 (R.I.2001). However, in *Kayser–Roth,* we cited *Koppers* for the principle that "non-settling insurers are entitled either to a setoff of settlement amounts received by the insured or to a proportional credit for those shares that would have been allocated to the settling insurers." *Kayser–Roth,* 770 A.2d at 413 (citing *Koppers,* 98 F.3d at 1443). We did not cite *Koppers* as it pertains to the fortuity principle, nor have we held that insureds are precluded from coverage for damages resulting from intentional acts.

The defendants further attempt to link the fortuity principle to our holding in *Kayser–Roth* by asserting that it is a "variant" of the known loss doctrine, which we recounted in that case. The known loss doctrine bars recovery "when the insured has knowledge, *before the inception of an insurance policy,* that the insured has suffered the threat of an immediate economic loss, as a result of some event, and that the reality of that loss occurring is a certainty." *Kayser–Roth,* 770 A.2d at 415. (Emphasis added.) Clearly there is a difference between an insured making a claim for a covered intentional tort occurring within the policy period and an insured purchasing insurance with an eye toward recovering for damages arising from a past event of which he has full knowledge.

Similarly, the motion justice properly distinguished the current controversy from *Morin v. Aetna Casualty and Surety Co.,* 478 A.2d 964 (R.I.1984). In *Morin,* this Court concluded that the parties were barred from recovering homeowner's insurance for fire damage because they had set the fire that resulted in the loss. *Id.* at 966–67. We held that "[t]o permit such recovery * * * would violate all standards of public policy and defy the administration of justice." *Id.* at 967. The motion justice limited *Morin* to its facts, finding that the town was not barred from recovery because its actions "were not conducted with an eye towards illegal insurance recovery."

The defendants argue that such a limited view of *Morin* cannot be squared with this Court's holding in *Peerless* because there was no indication in *Peerless* that the insured committed sexual assault on a child with the intent to defraud his insurance company. As noted, the insured in *Peerless* was barred from recovery because his homeowner's policy precluded coverage for intentional acts and could not reasonably be read to provide coverage for sexual molestation. The question whether the insured acted with intent to defraud his insurer was never raised because, unlike the claim in *Morin* for loss due to fire, the policy in *Peerless* did not provide coverage for the injury suffered.

The defendants also rely on *Foxon Packaging Corp. v. Aetna Casualty and Surety Co.,* 905 F.Supp. 1139 (D.R.I.1995), to support their public policy argument. We do not agree. In *Foxon,* the United States District Court for the District of Rhode Island held that an insurer was not obliged to defend an insured against a claim of intentional racial harassment, stating "[t]he Rhode Island Supreme Court has consistently held that insurance policies cannot insure for actions which are contrary to public policy." *Id.* at 1146. In reaching this conclusion, the court relied on *Allen v. Simmons,* 533 A.2d 541 (R.I. 1987). However, in *Allen,* this Court did not make such a broad statement; the issue addressed by this Court was whether liability for punitive damages may be shift-

ed to the insurer. *Id.* at 542.[14]

We agree with the motion justice's finding that Rhode Island public policy does not bar an insured from indemnification for intentional torts when the insurance policy explicitly provides such coverage.

## Policy Exclusion for Condemnation Claims

■ The defendants argue that the motion justice erred in finding the Trust policy's inverse condemnation exclusion inapplicable to the town's claim. The "Inverse Condemnation Exclusion Clause" says:

"This policy does not cover claims for loss or damage or any liability of [the town] arising out of or in any way connected with the operation of the principles of eminent domain, condemnation by whatever name called regardless of whether such claims are made directly against the [town] or by virtue of any agreement entered into by or on behalf of the [town]."

In *L.A. Ray Realty II*, 698 A.2d at 209, this Court held that the town violated the underlying claimants' civil rights under the Due Process Clause of the Fifth Amendment ("[n]o person shall be * * * deprived of life, liberty, or property, without due process of law") and not the Takings Clause ("nor shall private property be taken for public use, without just compensation"). U.S. Const. Amend. V.

The motion justice found that a regulatory takings analysis was unwarranted because this Court did not conclude that the underlying claimants had been deprived of all economically viable use of their property. Pointing to the concurring and dis-

senting opinion in *L.A. Ray Realty II*, 698 A.2d at 218–19 (Flanders, J., concurring in part and dissenting in part), the defendants argued that the town's actions amounted to an inverse condemnation. The motion justice rejected defendants' argument, stating that "the majority's holding clearly indicates that the [town's] actions amounted to a deprivation of the underlying claimants' property rights without due process, not an inverse condemnation." We agree with this finding; the majority in *L.A. Ray Realty II* specifically found a violation of the underlying claimants' rights to procedural and substantive due process and not a violation of the Takings Clause of the Fifth Amendment to the United States Constitution, nor article 1, section 16, of the Rhode Island Constitution. *L.A. Ray Realty II*, 698 A.2d at 210–11. Further, the record in the underlying case discloses that the claim against the town alleging inverse condemnation was withdrawn before trial. Thus, no takings claim was before this Court on appeal.

We, therefore, conclude that the inverse condemnation exclusion does not apply to the town's claim for indemnification because the settlement paid to the underlying claimants did not arise from an eminent domain proceeding or a regulatory taking.

## Defendant Coregis's Assignments of Error

Coregis contends that it is not required to indemnify the town because the settlement arose out of an act of inverse condemnation, coverage of which is precluded under two exclusions.[15] Coregis asserts

---

**14.** Certainly, were we faced with an award of punitive damages against the town officials responsible for the fraudulent acts underlying this suit, we would not permit those damages to be shifted to the defendants.

**15.** Coregis's inverse condemnation exclusion says as follows: "[t]his insurance does not apply to any liability arising out of any constitutional provision, statute, county, municipal or local ordinance or law; administrative order; or rule of law concerning the power of

that its exclusions are broader than that of the Trust policy, barring coverage for any loss arising out of an inverse condemnation. We need not pass upon the breadth of Coregis's exclusionary language because, as discussed *supra*, we affirm the motion justice's finding that the town's actions did not amount to a taking.

Coregis also asserts that its exclusion for expected or intended acts precludes coverage. The exclusion provides, in pertinent part: "[t]his policy does not provide coverage for liability which is expected or intended by the Insured." As discussed herein, the explicit coverage for the enumerated intentional torts and exclusion of intended harm creates facial ambiguity that we construe in favor of the insured.

Coregis further argues that it is not required to indemnify the town because diminution in property value is not a physical injury, as required under the policy definition of "property damage."[16] We deem this argument to be without merit because the underlying claims are for personal injuries resulting from civil rights violations and not for property damage.

 Lastly, Coregis contends that its public officials errors or omissions exclusion precludes coverage in this case. The motion justice found that, although defendants were liable under the general liability policy, they were not liable under the policy's errors and omissions clause, which says: "Underwriters shall not be liable to make payment for loss in connection with any claim made against the [town] if a judgment or final adjudication in any ac-

tion brought against the [town] shall be based on a determination that acts of fraud or dishonesty were committed by the [town]."

Unlike the Trust policy errors and omissions clause, which hinges on a judgment or adjudication of fraud or dishonesty, Coregis's public officials errors and omissions exclusion hinges on allegations of negligence:

"This policy does not apply to any claim made against any insured in his capacity as, or arising out of his activities as a public official and caused by, or alleged to have been caused by, any negligent act, error or omission of any insured, or any other person for whose actions any insured is legally responsible."

The town's liability arose from the town officials' intentional violation of the underlying claimants' civil rights. This is not a claim arising from a public official's "negligent act, error or omission" and that exclusion is not applicable in the context of this case.

## Conclusion

For the foregoing reasons, we affirm the judgment of the Superior Court. The papers of the case are remanded to the Superior Court.

Justice FLAHERTY and Justice ROBINSON did not participate.

---

eminent domain or of condemnation, or any acts arising out of or caused by the Insured thereunder." Coregis's municipality endorsement says: "[t]his policy does not apply to: * * * liability arising out of inverse condemnation proceedings."

**16.** The policy defines property damage as follows: "(1) physical injury to or destruction of tangible property, including loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by a covered occurrence."