# United States Court of Appeals
## For the First Circuit

No. 10-2087

HENRY ROSCITI, DONNA ROSCITI,
AND HENRY ROSCITI, JR.,

Plaintiffs, Appellants,

v.

THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, U.S. District Judge]

Before

Torruella, Boudin, and Lipez,
Circuit Judges.

Robert D. Fine, with whom Douglas J. Emanuel and Chace, Ruttenberg & Freedman, LLP, were on brief for appellants.
Stephen M. Prignano, with whom Raymond M. Ripple and Edwards Angell Palmer & Dodge LLP, were on brief for appellee.

October 7, 2011

**TORRUELLA**, **Circuit Judge**.  Appellants Henry Rosciti, Donna Rosciti, and Henry Rosciti, Jr. ("the Roscitis") sued Monaco Coach Corporation ("Monaco") over alleged defects in a motor home Monaco manufactured.  Monaco was self-insured for liability up to $500,000, and appellee Insurance Company of the State of Pennsylvania ("ICSOP") provided excess insurance for liability above $500,000.  Monaco went bankrupt shortly after the Roscitis filed their lawsuit.  Therefore, the Roscitis added ICSOP as a defendant, invoking a Rhode Island statute allowing tort victims to recover damages directly from liability insurers of a bankrupt tortfeasor, but only within the limits of the insurance policy.

ICSOP moved for summary judgment, arguing that its coverage obligations had not been triggered.  ICSOP pointed to a limiting provision in Monaco's policy stating that ICSOP's duty to pay arose only after Monaco had paid the initial $500,000, which Monaco had not done.[1]  The Roscitis countered by pointing to other language in the policy providing that Monaco's bankruptcy would not relieve ICSOP of its payment obligations.  The Roscitis also argued that if the provisions on which each side relied created a conflict in the policy, Rhode Island law required this conflict to be resolved in the Roscitis' favor.

_____

[1]  The Roscitis never specified a precise dollar amount for their claim against Monaco. However, they maintain that it is greater than $500,000.  See Section I, infra.

The district court agreed with ICSOP and granted its summary judgment motion. See Rosciti v. Liberty Mut. Ins. Co., 734 F. Supp. 2d 248 (D.R.I. 2010). However, because we find that enforcing the limiting provision in the policy would violate the public policy of Rhode Island, we reverse and remand for further proceedings.

## I.  **Background**

Henry and Donna Rosciti purchased a mobile home manufactured by Monaco on January 17, 2004. The mobile home allegedly suffered from numerous defects that resulted in water leakage. Monaco attempted to fix the problems at various times between 2004 and 2007, but these attempts were allegedly unsuccessful. The Roscitis claim that the water leakage eventually led to the growth of toxic mold in the mobile home, rendering it uninhabitable. Henri Rosciti, Jr. occupied the mobile home, and the Roscitis allege that he developed a range of medical problems as a result of his exposure to the mold.

During the relevant time period, ICSOP provided "Special Excess Liability Policies" (the "Excess Policies") to Monaco. The Excess Policies provided liability coverage for claims above $500,000, up to limits ranging from $1.5 million to $2.5 million,

depending on the policy.[2] Monaco was self-insured for liability up to a "retained limit" of $500,000.

ICSOP's insurance policies with Monaco contain two provisions that are central to this appeal. The first of these is Section III(c) (the "Retained Limit Provision"), which provides:

> [ICSOP's] duty to pay any sums that [Monaco] become[s] legally obligated to pay arises only after there has been a complete expenditure of [Monaco's] retained limit(s) by means of payments for judgments, settlements, or defense costs.

The second is Section VI(D), entitled "Bankruptcy or Insolvency" (the "Bankruptcy Provision"), which provides:

> [Monaco's] bankruptcy, insolvency or inability to pay, or the bankruptcy, insolvency or inability to pay of any of [Monaco's] underlying insurers shall not relieve [ICSOP] from the payment of any claim covered by this Policy. But under no circumstances shall such bankruptcy, insolvency, or inability to pay require [ICSOP] to drop down or in any way replace [Monaco's] retained limit or assume any obligation associated with [Monaco's] retained limit.

On December 18, 2008, the Roscitis sued Monaco in the Superior Court of Rhode Island, asserting claims of negligence, breach of warranty, and strict products liability. On March 5, 2009, after filing its Answer but before responding to the Roscitis' discovery requests, Monaco filed for Chapter 11

---

[2] The annual policy limit was $1.5 million from March 4, 2004, until March 4, 2006, after which the limit increased to $2.5 million.

bankruptcy protection in the Bankruptcy Court for the District of Delaware.[3] On June 19, 2009, the Roscitis filed an Amended Complaint in the Rhode Island Superior Court adding Monaco's insurers, including ICSOP, as defendants. The Roscitis argued that Monaco's insurers were liable under Rhode Island's "direct action" statute, which provides:

> Any person, having a claim because of damages of any kind caused by the tort of any other person, may file a complaint directly against the liability insurer of the alleged tortfeasor seeking compensation by way of a judgment for money damages whenever the alleged tortfeasor files for bankruptcy, involving a chapter 7 liquidation, a chapter 11 reorganization for the benefit of creditors or a chapter 13 wage earner plan, provided that the complaining party shall not recover an amount in excess of the insurance coverage available for the tort complained of.

R.I. Gen. Laws § 27-7-2.4.

The Roscitis have never specified the amount of monetary damages they are seeking. However, they assert that the value of their claim is greater than the $500,000 retained limit because their claim includes at least the purchase price of the mobile home plus Henry Rosciti, Jr.'s medical expenses. Monaco has not paid any portion of the Roscitis' claims, and because it is currently in bankruptcy proceedings, all creditors' claims are stayed.

---

[3] On June 29, 2009, the Bankruptcy Court for the District of Delaware converted Monaco's bankruptcy from Chapter 11 to Chapter 7.

ICSOP removed the case to the U.S. District Court for the District of Rhode Island on July 29, 2009. The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).[4] The Roscitis voluntarily dismissed Monaco's other insurers, Liberty Mutual Insurance Company and Liberty Northwest Insurance Corp., on April 21, 2010.

ICSOP moved for summary judgment on May 20, 2010. ICSOP contended that the Roscitis' claim should be dismissed because there was no coverage available for it under the Excess Policies. ICSOP argued it was not liable for any portion of the Roscitis' claim under $500,000 because the Bankruptcy Provision explicitly stated that ICSOP would not have to "drop down" and pay anything under the retained limit. ICSOP also argued that it was not liable for the part of the Roscitis' claim above the $500,000 limit because its payment obligation had never been triggered. ICSOP noted that the Retained Limit Provision specified that ICSOP's obligation to pay arose "only after there ha[d] been a complete expenditure of [Monaco's] retained limit." Because Monaco had not yet exhausted the retained limit, ICSOP argued that it had no obligation to pay anything above the limit.[5]

---

[4] The Roscitis, Monaco and the insurers are all citizens of different states, and the amount in controversy is at least $262,515, the purchase price of the mobile home.

[5] ICSOP also argued that the Roscitis' breach of contract, breach of warranty, and negligence claims were excluded from coverage to the extent they seek damages for injury to the mobile home itself.

In response, the Roscitis conceded that ICSOP was not liable for any portion of their claim below $500,000. However, they argued that because the Bankruptcy Provision stated that Monaco's bankruptcy would not relieve ICSOP of any payment obligations, ICSOP was still liable above $500,000, despite the fact that Monaco had not yet exhausted the retained limit. The Roscitis also argued that to the extent the Retained Limit Provision conflicted with the Bankruptcy Provision, Rhode Island law required that the conflict be resolved in their favor. See Amica Mut. Ins. Co. v. Streicker, 583 A.2d 550, 552 (R.I. 1990) (stating that ambiguities in insurance policies are strictly construed against the insurer).

The district court held that there was no conflict between the Retained Limit Provision and the Bankruptcy Provision. Rosciti, 734 F. Supp. 2d at 251-52. The Bankruptcy Provision provides that ICSOP would still be liable for claims "covered by" the policies if Monaco went bankrupt. The court read this language to incorporate the exclusions that appeared elsewhere in the Excess Policies, including in the Retained Limit Provision. Id. at 252. Thus, because Monaco had not exhausted the retained limit, ICSOP's payment obligations could not be triggered even if the Roscitis'

---

The Roscitis conceded this point based on other provisions of the Excess Policies. The district court did not reach these issues and they are not present in this appeal. We take no position on the validity of these arguments.

-7-

claim was over $500,000, and therefore the Roscitis' claim could never be "covered" under the Excess Policies.  Id.

The court also held that the direct action statute did not void the Retained Limit Provision.  The court reasoned that the Retained Limit Provision could not be read as a "grab for immunity" from the direct action statute because there were circumstances under which Monaco conceivably could have exhausted the retained limit.  Id. at 254.  The court also noted that the direct action statute, § 27-7-2.4, explicitly limited claims against insurers to "coverage available" under the plan, and concluded that exhaustion requirements such as the Retained Limit Provision were not prohibited by the statute.  Id. at 254-55.

This appeal followed.

## II.  Discussion

We review a district court's grant of summary judgment de novo, resolving all evidentiary conflicts and drawing all reasonable inferences in favor of the nonmoving party -- in this case, the Roscitis.  Kuperman v. Wrenn, 645 F.3d 69, 73 (1st Cir. 2011).  "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Robidoux v. Muholland, 642 F.3d 20, 22 (1st Cir. 2011).  "[The] party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material

-8-

fact and that it is entitled to judgment as a matter of law." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000).

Because this case was heard in the District of Rhode Island pursuant to the court's diversity jurisdiction, we apply the substantive law of the state of Rhode Island. See Artuso v. Vertex Pharm., Inc., 637 F.3d 1, 5 (1st Cir. 2011) ("[A] federal court sitting in diversity must apply the substantive law of the forum state.") (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)). Rhode Island's direct action statue, § 27-7-2.4, only allows the Roscitis to recover "insurance coverage available" for their claim from ICSOP. Therefore, the central question for this court is whether there can be any coverage available under the Excess Policies in light of Monaco's inability to exhaust its retained limit.

ICSOP urges us to affirm the district court's ruling that there is no coverage available because the Retained Limit Provision has not been satisfied. The Roscitis raise two arguments against the application of the Retained Limit Provision. First, they argue that the Retained Limit Provision and the Bankruptcy Provision create a conflict in the Excess Policies that must be resolved in their favor. Second, they argue that the direct action statute renders the Retained Limit Provision inapplicable. We address these points in turn.

## A.  Ambiguity in the Excess Policies

Ordinarily, when interpreting an insurance policy, a court "look[s] at the four corners of [the] policy, viewing it in its entirety, affording its terms their plain, ordinary and usual meaning." Town of Cumberland v. R.I. Interlocal Risk Mgmt. Trust, Inc., 860 A.2d 1210, 1215 (R.I. 2004) (internal quotation marks omitted).  However, "[i]n situations in which ambiguity does exist in an insurance policy or the terms are subject to more than one reasonable interpretation, the contract will be strictly construed against the insurer." Amica Mut. Ins. Co., 583 A.2d at 552.

The Roscitis argue that there is a clash between the Retained Limit Provision and the Bankruptcy Provision.  The Bankruptcy Provision says that Monaco's "bankruptcy, insolvency or inability to pay . . . shall not relieve [ICSOP] from the payment of any claim covered by" the Excess Policies.  However, the Roscitis argue, if the Retained Limit Provision remains in force, then its net effect in this case is to "relieve [ICSOP] from the payment of [a] claim covered by" the Excess Policies.  Since this reading would nullify the Bankruptcy Provision, the Roscitis urge us to read an exception to the Retained Limit Provision for situations where, as here, it cannot be satisfied due to insolvency.

ICSOP, in contrast, argues that the Roscitis are asking us to impermissibly read ambiguity into the contract where none

exists. See Town of Cumberland, 860 A.2d at 1215 (court should not "indulge in mental gymnastics to read ambiguity where none is present") (internal omission and quotation marks omitted). ICSOP notes that the Bankruptcy Provision applies only to claims "covered by" the Excess Policies. This, ICSOP argues, is a clear reference to limitation provisions elsewhere in the Excess Policies, including the Retained Limit Provision. Thus, according to ICSOP, the meaning of the Excess Policies is clear: ICSOP is liable if Monaco is bankrupt, but only if the Retained Limit Provision is somehow satisfied.

We agree with ICSOP that the policy is not ambiguous. We see no inherent conflict between the Retained Limit Provision and the Bankruptcy Provision; rather, we agree with ICSOP that the latter is plainly subject to the limitations in the former. We disagree with the Roscitis that the reverse reading of the Excess Policies -- under which the Bankruptcy Provision is a limit on the Retained Limit Provision -- is also plausible. The Bankruptcy Provision, by referring to claims "covered by this Policy," clearly alerts the reader to examine the rest of the contract for possible limits on ICSOP's liability. The Retained Limit Provision, in contrast, contains no such cautionary language; ICSOP is liable "only after there has been a complete expenditure of [Monaco's] retained limit" (emphasis added).

-11-

Since we will not read ambiguity into the contract, see Town of Cumberland, 860 A.2d at 1215, we will not automatically construe the Excess Policies against ICSOP. Contra Amica Mut. Ins. Co., 583 A.2d at 552. Rather, we will give the Excess Policies their plain meaning: ICSOP is still liable above the retained limit if Monaco is bankrupt, but only after Monaco exhausts the retained limit. However, this does not end our inquiry, for we must still consider whether this result is compatible with public policy.

**B. Public Policy**

Under Rhode Island law, a contract term will not be enforced if it violates public policy. Gorman v. St. Raphael Acad., 853 A.2d 28, 39 (R.I. 2004). If a contract provision frustrates a right created by statute, a court will void that provision as against public policy. Cf. Pepin v. Am. Universal Ins. Co., 540 A.2d 21, 22-23 (R.I. 1988) (voiding contract provision that was found to frustrate statutory right to binding arbitration).

The Roscitis argue that, as interpreted by the district court, the Retained Limit Provision nullifies their rights under § 27-7-2.4. Because Monaco has not exhausted and is now incapable of exhausting the $500,000 retained limit, the Roscitis cannot recover anything above that amount from ICSOP. This frustrates the Legislature's purpose in passing § 27-2-2.4, which was to "give an

-12-

aggrieved and injured party the right to proceed directly against an insurer in those circumstances in which the tortfeasor has sought protection under the applicable provisions of the United States Bankruptcy Code."  D'Amico v. Johnston Partners, 866 A.2d 1222, 1229 (R.I. 2005).

ICSOP counters, however, by noting that the Rhode Island Legislature limited recovery under § 27-7-2.4 to "insurance coverage available for the tort complained of" (emphasis added). Thus, ICSOP argues, it was clearly not the Legislature's intent to expand the scope of coverage available under an insurance policy. Cf. Barber v. Canela, 570 A.2d 670, 671 (R.I. 1990) (holding that a related direct action statute, R.I. Gen. Laws § 27-7-2, "is designed only to provide a remedy to the injured party and not to enlarge the liability of the insurer beyond the limits stated in the policy") (emphasis added).  Yet ICSOP contends that nullifying the Retained Limit Provision would have precisely that effect, by eliminating the critical threshold requirement for ICSOP's obligations.  ICSOP also contends that the Roscitis' position would effectively require ICSOP to "drop down" below the $500,000 retained limit, since any recovery from ICSOP would represent the first dollars the Roscitis recover on their claim.

In deciding what Rhode Island's public policy requires in this case, we would ordinarily be bound by the teachings of the Rhode Island Supreme Court.  N. Am. Specialty Ins. Co. v. Lapalme,

-13-

258 F.3d 35, 38 (1st Cir. 2001). However, the parties have not identified, and we have not discovered, any ruling by the Rhode Island Supreme Court that directly addresses the question of whether a retained limit provision frustrates the purpose of § 27-7-2.4. "'In the absence of a definitive ruling by the highest state court, [we] may consider analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'" Id. (quoting Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994)). We thus examine the broader public policy context surrounding § 27-7-2.4 and explore how other courts have resolved the policy question present here. When we apply this analysis, we conclude that the Roscitis' position is correct.

Faced with insurance companies arguing that their policies were merely contracts of "indemnity" -- thus preventing recovery against the insurer without the insured actually discharging liability to the victim -- many states enacted legislation

> requiring that liability insurance contracts include a provision to the effect that the insolvency or bankruptcy of an insured shall not release an insurer from liability. In time, similar legislation almost certainly would have been adopted in every state had not insurers revised the standard policy forms used for liability insurance to provide coverage without regard to an insured's insolvency.

-14-

Robert Keeton & Alan Widiss, Insurance Law § 4.8(b), at 378 (practitioner's ed. 1988). Rhode Island does not have such a statute, which we term a "bankruptcy provision law." Nevertheless, it is clear that Rhode Island's public policy is to prevent insurance companies from avoiding their obligations when an insolvent insured cannot make an expenditure towards discharging liability. As noted above, the passage of § 27-7-2.4 reflects the Legislature's intent to preserve a tort victim's right of recovery when the insured became insolvent. Additionally, the Rhode Island Supreme Court has recognized the "generally agreed" rule that "the debtor's discharge does not affect the liability of the debtor's insurer for damages caused by the debtor." D'Amico, 866 A.2d at 1228 (quoting 4 Lawrence P. King, Collier on Bankruptcy, ¶ 524.05 & n.22, at 524-26 (15th rev. ed. 2000)). In light of this public policy, we conclude that the Retained Limit Provision cannot be enforced here. To do so would have the ultimate effect of allowing ICSOP to avoid its obligations thanks to Monaco's bankruptcy, a result which is contrary to the public policy of Rhode Island.

Our result is consistent with the result that many other courts have reached when dealing with insurance policies in which a bankruptcy provision in the policy is overridden by another provision that conditions the insurer's liability on some payment

by the insured.[6]  While courts considering the policy question at issue here have reached mixed results, in cases governed by the law of states with policy frameworks similar to Rhode Island's, courts have generally held that the limiting provision must yield to public policy.  Compare In re Vanderveer Estates Holding, LLC, 328 B.R. 18, 24 (Bankr. E.D.N.Y. 2005) (stating that public policy behind bankruptcy clause required under Illinois law "prevents insurers from avoiding indemnity obligations where self-insured retentions have not been paid by a bankrupt insured"), with Pak-Mor Mfg. Co. v. Royal Lines Ins. Co., No. SA-05-CA-135-RF, 2005 WL 3487723, at *4-*6 (W.D. Tex. Nov. 3, 2005) (rejecting policy argument).

For example, Albany Insurance Co. v. Bengal Marine, Inc. involved a policy requiring the insured to pay a certain deductible before the insurer became liable; the Fifth Circuit, applying Louisiana law, held that, in light of Louisiana's direct action statute, the insurer was liable for claims above the deductible up to the policy limit when the insured could not pay the deductible due to insolvency.  857 F.2d 250, 255-56 (5th Cir. 1988).  Other courts have reached a similar result by holding that enforcing retained limit or deductible provisions in this situation would

---

[6]  At least one commentator described this result as the "majority view" in this type of case.  See Patricia Bronte, "'Pay First' Provisions and the Insolvent Policyholder," Insurance Coverage Law Bulletin, June 2004.

defeat state bankruptcy provision laws. See, e.g., Home Ins. Co. of Ill. v. Hooper, 691 N.E.2d 65, 70 (Ill. App. Ct. 1998) (holding that an insurer's reliance on a retained limit provision -- referred to as a "self-insured retention limit" -- to avoid payment when the insured became insolvent was "directly contrary to the public policy as declared by the legislative enactment of" Illinois' bankruptcy provision law), cert. denied, 699 N.E.2d 1031 (Ill. 1998); Columbia Cas. Co. v. Fed. Press Co., 104 B.R. 56, 62-63 (Bankr. N.D. Ind. 1989) (reaching similar result based on Indiana bankruptcy provision law).

Conversely, in states without such a strong policy in favor of a claimant's right to recover from an insurance company in the event of the insured's insolvency, courts have reached the opposite result. For example, in Pak-Mor, the court distinguished Albany Insurance, Home Insurance, and Columbia Casualty by noting that those cases were based on public policy concerns not applicable to Texas. 2005 WL 3487723 at *5-*7. See also id. at *6 ("Under Texas law, insurers are free to issue policies that relieve them of liability in the bankruptcy context.").[7] Since there was no Texas public policy at issue, the court relied on what it found

---

[7] Texas also does not have a direct action statute; a non-party to an insurance contract may bring suit against an insurer to enforce an insurance agreement only if the non-party is a legal beneficiary of the contract or a judgment creditor of the insured. See Essex Inc., Co. v. Bayou Concession Salvage, Inc., 942 F. Supp. 258, 260 (E.D. La. 1996) (applying Texas law).

to be the plain meaning of the contract, which was that the retained limit requirement applied even in the face of the insured's bankruptcy. Id. at *5.

If, as in Pak-Mor, the language of the policy was the only factor controlling the outcome of this case, we would affirm the district court. See II(A), supra. However, we are dealing here with a legal framework very similar to those at issue in Albany Insurance, Home Insurance, and Columbia Casualty. We therefore believe that the logic of those cases applies.

We largely agree with ICSOP that public policy in Rhode Island does not require ICSOP to expand the scope of its coverage. However, we disagree that our holding results in any expansion of ICSOP's coverage obligations. If the Roscitis were to eventually win a judgment in an amount less than $500,000, ICSOP would not be liable for any portion of that judgment. Likewise, if the Roscitis were to win a judgment greater than $500,000, ICSOP would only be liable for the amount of the judgment above $500,000. Furthermore, any award against ICSOP would be capped by the limits of the Excess Policies. Thus, ICSOP faces the same amount of potential exposure it would have faced if Monaco had not gone bankrupt.

ICSOP contends that allowing the Roscitis' claim to proceed would expand ICSOP's obligations in two additional ways. First, ICSOP argues that it would be required to pay the "first dollars" of the Roscitis' claim. However, this argument conflates

two distinct senses of "first dollars." It is true that, if the Roscitis prove damages greater than $500,000, ICSOP will pay the "first" dollars to the Roscitis, insofar as nobody else will have paid anything. However, ICSOP will not pay the "first dollars" insofar as any recovery from ICSOP will be reduced by $500,000.

Second, ICSOP argues that its obligations would be expanded because it would be forced to defend claims within the self-insured layer. ICSOP contends that it did not factor this obligation into the premiums it charged to Monaco. However, ICSOP will not be defending a claim within the self-insured layer -- the Roscitis have maintained throughout that their claim is above $500,000, even though they have not specified a precise dollar figure. Thus, ICSOP will be defending a claim above the self-insured limit, with total exposure capped at the Excess Policy limits. Moreover, there is insufficient evidence for us to conclude at the summary judgment stage that ICSOP did not contemplate assuming defense costs in this situation. The evidence we do have regarding what ICSOP factored into the premiums is the language of the Excess Policies. Section I(B)(1) of the Excess Policies expressly gives ICSOP the right to "defend or participate in the defense of any claim or suit"; it also provides that ICSOP will bear its own costs for doing so. Thus, we cannot conclude

-19-

that ICSOP did not contemplate having to pay defense costs in this scenario.[8]

More importantly, even assuming _arguendo_ that our decision forces ICSOP to pay more in defense costs than it had anticipated when calculating the premium, we cannot say that this result violates Rhode Island public policy. The limit on claims specified in the direct action statute is a limit based on "coverage available." R.I. Gen. Laws. § 27-7-2.4. This clearly means that an insurer cannot be required to pay more than the policy limits -- or drop down below a retained limit -- if the insured is bankrupt. However, nothing in the statute suggests that an insurer cannot be put into a position that might require it to spend more money than it had anticipated to defend against a claim. Indeed, one would expect that in most cases under the direct action statute, the insurer will be shouldering all of the defense costs

---

[8] ICSOP also argues that because Monaco is no longer able to pay claims within the self-insured layer, the Roscitis now have no incentive to settle their case for any amount less than $500,000. ICSOP suggests that this increases its defense and settlement costs for this case. While this point has some merit, we do not think it outweighs the strong policy considerations that favor the Roscitis. Firstly, we have no evidence regarding the extent to which ICSOP factored the probability of settlement into the premiums it charged Monaco. Secondly, it is difficult to quantify exactly how much this factor will increase ICSOP's costs; the risk that an opposing party will not want to settle at all is inherent in any litigation. Finally, we have no way of estimating how likely a settlement below $500,000 would have been had Monaco still been in the picture; if the probability of settlement below $500,000 would have been small regardless, ICSOP is not seriously disadvantaged by having the probability go from a small percentage to zero.

-20-

without being able to share them with the insured; the Legislature surely recognized this when it passed § 27-7-2.4.

As a fallback, ICSOP argues that the Retained Limit Provision does not violate public policy because, as the district court recognized, there are circumstances under which ICSOP could have been liable if the insured became insolvent. For example, if the policyholder were not self-insured, but had a primary insurance policy, the primary insurance could pay the retained limit. Rosciti, 734 F. Supp. 2d at 252. Alternately, where, as here, there is no primary insurer, the policyholder might still reach the retained limit before reaching insolvency; in fact, the satisfaction of the retained limit might be what makes the policyholder insolvent. Id. at 252-53. Finally, a bankrupt policyholder might pay tort claims pursuant to a Chapter 11 reorganization. Id. at 253. However, while we agree with ICSOP and with the district court that the above-mentioned scenarios are possible, we think a far more likely fact pattern is what happened in this case -- an insolvent policyholder will be unable to pay the retained limit. Because in this scenario the Retained Limit Provision effectively gives the insurer immunity from suit, the Retained Limit Provision cannot be enforced.

### III. Conclusion

Because we hold that the Retained Limit Provision cannot be enforced, we reverse the district court's grant of summary

-21-

judgment and remand for further proceedings consistent with this opinion.

**<u>Reversed and Remanded</u>**.