**TRANSCHED SYSTEMS
LIMITED, Plaintiff,**

v.

**FEDERAL INSURANCE COMPANY,
Defendant.**

C.A. No. 12–939–M–PAS.

United States District Court,
D. Rhode Island.

Signed Dec. 22, 2014.

Christine K. Bush, Hinckley, Allen & Snyder LLP, Providence, RI, Matthew J.

Ginsburg, Robert J. Gilbert, Gilbert and Renton LLC, Andover, MA, for Plaintiff.

Thomas C. Angelone, Hodosh, Spinella & Angelone, Providence, RI, Michael O. Kassak, White and Williams LLP, Cherry Hill, NJ, for Defendant.

## MEMORANDUM & ORDER

JOHN J. McCONNELL, JR., District Judge.

The dispute in this case centers on whether a Federal Insurance Company insurance policy, which contains exclusions for breach of contract and deliberate fraud claims, covers a judgment awarded to TranSched Systems Limited on a jury's verdict for the tort of intentional misrepresentation against a Federal insured. TranSched and Federal have filed cross motions in this case, each seeking summary judgment on these insurance policy coverage issues.[1] (ECF Nos. 31, 32). For the reasons articulated below, Federal's motion is DENIED IN PART and GRANTED IN PART and TranSched's motion is GRANTED IN PART and DENIED IN PART.

## I. FACTS AND TRAVEL

In 2004, TranSched began negotiations with Versyss Transit Solutions, LLC, Versyss Commercial Systems, LLC, and Holbrook Systems Inc. (collectively "Versyss") in an effort to acquire Versyss' transportation software assets, including the Titan software product. (ECF No. 33 at ¶ 2; ECF No. 31-2 at ¶¶ 4–5). TranSched and Versyss completed the transaction for the software assets in February 2005 and executed a Bill of Sale, a General Conveyance, an Intellectual Property Assignment, an Assignment and Assumption Agreement, a Receipt that transferred ownership from Versyss to TranSched, and an Asset Purchase Agreement ("APA"). (ECF No. 33 at ¶¶ 2–3).

The software assets were not delivered as expected and, at some point after the deal closed, TranSched realized that Versyss breached the APA. Specifically, TranSched learned that Versyss' Vice President, Sheryl Miller and its Vice President of Product Development and Chief Technology Officer, Lorin Miller had made material misrepresentations about the time frame and viability of the Titan software during the negotiations and execution of the transaction. (ECF No. 31-2 at ¶ 13; ECF No. 33 at ¶¶ 20–22). In light of the misrepresentations and breach of the APA, TranSched sued Versyss in Delaware Superior Court ("Underlying Suit"). (ECF No. 33 at ¶ 19). Federal Insurance Company, with whom Versyss had an insurance policy,[2] retained counsel for Versyss in the Delaware case. (Id. at ¶ 50). The parties attempted to settle the case prior to trial, but were not successful. (Id. at ¶¶ 52–54).

At trial, TranSched presented evidence that Sheryl Miller lied and concealed information concerning the progress of Titan. (Id. at ¶¶ 33–35, 38). The jury heard evidence that Ms. Miller provided TranSched with a project plan that misrepresented the time line for Titan's completion though

---

1. TranSched's motion is captioned "partial" because it did not move on its claims in Counts III and IV for statutory and common-law bad faith. The Court previously stayed those counts pending resolution of Counts I and II. (ECF No. 19 at 11).

2. Insurance Policy No. 8159–5652 (the "Policy") contained "Corporate Liability Coverage" under the "Directors & Officers Liability Coverage Section" (D & O Section) subject to the policy's terms, limitations, and exclusions. (ECF No. 33 at ¶¶ 6, 10). The D & O Section contained a "Limited Contract Exclusion" clause and a "Fraud Exclusion" clause. (Id. at ¶¶ 15, 17).

it also appears from the record that Ms. Miller gave conflicting testimony at trial about the information that she provided to TranSched about Titan and whether she in fact made misrepresentations about Titan's progress. (*Id.* at ¶¶ 33–34, 38). The jury heard other witnesses testify that, despite Ms. Miller's indication in her December 2004 project plan that Titan would be ready for beta testing within three months, very little code had been written as of the transaction closing date. (*Id.* at ¶¶ 34–36). Ms. Miller also testified that she knew that some Titan customers were unhappy and planned to stop using Titan software. (*Id.* at ¶ 38).

TranSched obtained a jury verdict in the Underlying Suit against Versyss. The jury found against Versyss on three grounds: (1) intentional misrepresentation, (2) breach of contract regarding misrepresentation and warranties under the APA, and (3) breach of the covenant of good faith and fair dealing. (*Id.* at ¶ 41). The jury awarded TranSched $500,000 in damages and, upon motion, the trial judge awarded TranSched $19,874.25 in costs and $170,268.75 in prejudgment interest. (*Id.* at ¶¶ 42–43). The court entered final judgment in the Underlying Suit and there are no appeals pending. (*Id.* at ¶ 47). Versyss failed to pay the judgment and is no longer in business. (*Id.* at ¶ 49). TranSched attempted to collect the judgment from Versyss' insurance carrier, Federal. Federal denied any duty to pay, claiming that the damages awarded were not covered because the two exclusions in the Policy preclude coverage. (*Id.* at ¶¶ 48–49).

TranSched then brought this suit, seeking satisfaction of the judgment in the Underlying Suit. Count I of TranSched's complaint alleges that the Policy provides coverage and Count II alleges that TranSched is entitled to additional dam-ages, interest, and fees under R.I. Gen. Laws § 27–7–2.2, Rhode Island's "rejected settlement offer" statute, because Federal failed to respond to TranSched's pre-trial settlement demands for a demand within the Policy limits. Federal moved to dismiss under Rule 12 of the Federal Rules of Civil Procedure, arguing that TranSched failed to state a claim upon which relief could be granted. The Court denied Federal's motion, finding that TranSched's complaint, when read in the light most favorable to TranSched, adequately pled the two legal claims. *TranSched Systems Ltd. v. Federal Ins. Co.*, 958 F.Supp.2d 331, 338 (D.R.I.2013). Discovery ensued and now both parties now seek summary judgment as to Counts I and II.

## II. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure directs courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a). When evaluating " 'cross-motions for summary judgment, the standard does not change; [courts] view each motion separately and draw all reasonable inferences in favor of the respective non-moving party.' " *Bonneau v. Plumbers & Pipefitters Local Union 51 Pension Trust Fund*, 736 F.3d 33, 36 (1st Cir.2013) (quoting *Roman Catholic Bishop of Springfield v. Springfield*, 724 F.3d 78, 89 (1st Cir. 2013)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed.R.Civ.P. 56(c)(3). A summary judgment motion "cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir.2010).

## III. ANALYSIS

█ The first issue in this case is whether Federal has proven that any exclusion in the Policy is applicable to the damages verdict on TranSched's intentional misrepresentation claim in the Underlying Suit.[3] When an exclusion in an insurance policy is at issue, the analysis typically follows two steps. First, the insured "bears the burden of proving a prima facie case, including but not limited to the existence and validity of a policy, the loss as within the policy coverage, and the insurer's refusal to make payments as required by the terms of the policy." *Gen. Accident Ins. Co. of Am. v. Am. Nat. Fireproofing, Inc.,* 716 A.2d 751, 757 (R.I. 1998).[4] "[A]ny doubts as to the adequacy of the pleadings to encompass an occurrence within the scope of the policy must be resolved in the insured's favor." *Allstate Ins. Co. v. Russo,* 641 A.2d 1304, 1306 (R.I.1994). Second, if the insured sustains its initial burden, and where an insurer seeks to deny coverage under a policy exclusion, "[t]he insurer then bears the burden of proving the applicability of policy exclusions...." *Gen. Accident,* 716 A.2d at 757; *see also Am. Title Ins. Co. v. East West Fin.,* 16 F.3d 449, 455 (1st Cir.1994).

### A. COVERAGE

█ Federal provided claims-made coverage to all of the Versyss entities for claims made during the policy period. Coverage C (the Corporate Liability Coverage) provides that "[Federal] shall pay Loss on behalf of the Insured Organization resulting from any Insured Organization Claim first made against such Insured Organization during the Policy Period, or any applicable Extended Reporting Period for Wrongful Acts." (ECF No. 33 at ¶ 10). The Policy goes on to define "Wrongful Acts" (Section (U)(1)) as "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted by: [...](b) for purposes of coverage under Insuring Clause (c): any Insured Organization." (*Id.* at ¶ 10). Thus, Coverage C read together with section (U)(1)(b) reveals the existence of coverage for claims against Versyss for errors and other negligent acts Versyss committed. It is undisputed that Federal refused to pay the damages that the jury imposed on Versyss. As such, TranSched has established a *prima facie* case for coverage and, as there are two exclusions in the Policy, the burden shifts to Federal to prove that either or both of the exclusions apply. *See Gen. Accident,* 716 A.2d at 757.

### B. THE EXCLUSIONS

█ Under long-standing and definitive Rhode Island law, an "exclusion from coverage in [an] ... insurance policy must be clear and unambiguous." *Am. Commerce Ins. Co. v. Porto,* 811 A.2d 1185, 1192 (R.I.2002) (internal quotation marks and citation omitted). It is also well established that "exclusionary clauses which are subject to more than one interpretation are to be construed in the manner most favorable to the insured, ... and the general principle that insurance contract pro-

3. Only the intentional misrepresentation claim forms the basis for potential insurance coverage because there is no question that the other two counts are contract-based and therefore excluded.

4. This Court has previously held that Rhode Island substantive law applies to this dispute because Federal issued the Policy in Rhode Island to Versyss, a Rhode Island corporation, and because this case is before this Court pursuant to diversity jurisdiction. *Rosciti v. Ins. Co. of Penn.,* 659 F.3d 92, 96 (1st Cir.2011).

visions subject to more than one interpretation are construed strictly against the insurer." *City of East Providence v. First Am. Title Ins. Co.*, C.A. No. 10–199, 2011 WL 5521246, at *6 (D.R.I. Oct. 13, 2011) (internal citations omitted); *report and recommendation adopted*, 2011 WL 5527604 (D.R.I. Nov. 14, 2011); *see also Textron, Inc. v. Aetna Cas. & Sur. Co.*, 638 A.2d 537, 539 (R.I.1994).

In support of its motion for summary judgment as to TranSched's Count I, Federal argues that the Policy's Limited Contract and Fraud Exclusions apply barring indemnification. TranSched asserts in its motion that the exclusions are inapplicable. The Court will examine the effect of the limited contract exclusion first, followed by an analysis of the deliberate fraud exclusion.

**1. The Limited Contract Exclusion**

The Limited Contract Exclusion provides in relevant part that:

(C) No Coverage will be available under Insuring Clause (C) for any Insured Organization Claim: * * *

(2) based upon, arising from, or in consequence of any actual or alleged liability of an Insured Organization under any written or oral contract or agreement, provided that this Exclusion (C)(2) shall not apply to the extent that an Insured Organization would have been liable in the absence of the contract agreement;

(ECF No. 33 at ¶ 17). The Court has already determined that the language of this exclusion is not ambiguous and therefore, " '[t]he contract terms must be ap-

plied as written and the parties are bound by them.' " *TranSched*, 958 F.Supp.2d at 334 (quoting *Amica Mut. Ins. Co. v. Streicker*, 583 A.2d 550, 551 (R.I.1990)).

■ The contract exclusion language excludes coverage when the claim arose from liability of the Insured under a contract.[5] To put it another way, the Policy provides coverage where the claim is not based on or arising from any actual or alleged liability under a contract. The question therefore is did Versyss' intentional misrepresentations arise from the APA or were they independent of it? Additionally, there is an exception to this exclusion. The exception would make the exclusion inapplicable if Versyss would have been liable to TranSched even in the absence of the APA. If the Court finds, after analyzing the exclusion, that it is inapplicable, then it does not have to reach the exception to the exclusion. As such, the Court will address both sides' arguments on the exclusion first.

Federal maintains that the Policy's contract exclusion precluded indemnification for Versyss because TranSched's claims against Versyss—including intentional misrepresentation—arose from the APA and the damages were directly tied to the terms of and were calculated under § 7(a)(i) of the APA. In support of its argument, Federal relies on evidence presented at trial, TranSched's post-trial motions in the Underlying Suit, and the jury instructions on the intentional misrepresentation claim and damages.

TranSched counters that the Limited Contract Exclusion does not apply be-

---

**5.** "[P]hrases such as 'arising out of,' when used in insurance contracts, do not connote a direct causal nexus. Rather, such phrases are understood to invoke the concepts of 'originating from, growing out of, flowing from, incident to or having connection with.' " *Penn–Am. Ins. Co. v. Lavigne*, 617 F.3d 82, 87 (1st Cir.2010) (quoting *Murdock v. Dinsmoor*, 892 F.2d 7, 8 (1st Cir.1989)) (internal quotation marks omitted). "The phrase 'arising from' is no exception to the general understanding that such contractual terms encompass a broad causal nexus." *Id.*

cause, although the jury found Versyss liable on two contract-based grounds, it also found Versyss liable for its intentional misrepresentations and that liability did not arise from nor was it based on the APA because it arose during the due diligence stage. TranSched maintains that the evidence the jury weighed on Versyss' liability for intentional misrepresentation was focused heavily on the Millers' misrepresentations regarding the Titan product, which occurred months before the APA came into existence. Therefore, it is impossible that those misrepresentations were "based upon," "arose from," or "in consequence of" liability incurred by Versyss when the APA did not yet exist. TranSched points to the fact that the parties focused much of their discovery on the due diligence period preceding the execution of the APA, that Ms. Miller provided TranSched with a false project plan for the Titan project before the APA was executed, that she intentionally concealed her awareness of Titan customer dissatisfaction and information that key customers were on the verge of abandoning the product, and that TranSched's CEO testified that had he known the truth about Titan's development, TranSched would have walked away from the transaction.

Moreover, TranSched claims that Versyss counsel conceded to the trial court in the Underlying Suit that the Millers' misrepresentation did not arise from and should not be considered part of the APA because the APA did not contain a single representation or warranty regarding the Titan project developmental status and that nearly all of the discovery was focused on the pre-APA period and was thus independent of the representations and warranties in the APA and irrelevant to the breach of contract. TranSched also argues that it maintained a clear line between evidence it presented for breach of contract claims and evidence for its intentional misrepresentation claim in the Underlying Suit. For example, in its joint pretrial stipulation in the Underlying Suit, TranSched specifically referred to "breaches" of contract when referring to representations and warranties set forth in the APA, and as "misrepresentation" when referring to the Millers' deceptions.

Courts have held that tort claims such as the intentional misrepresentation claim TranSched asserted at trial are not excluded from insurance coverage under the contract exclusion where the misrepresentations were made *before* the transaction and the transaction was generated by and was a consequence of the misrepresentations. *McPeek v. Travelers Cas. & Sur. Co. of Am.*, No. 2:06–CV–114, 2006 WL 1308087, at *4 (W.D.Pa. May 10, 2006). In other words, the exclusion does not apply where the claims "are based upon (pre-contract) fraud, rather than contractual liability." *Id.; see also Church Mut. Ins. Co. v. U.S. Liab. Ins. Co.*, 347 F.Supp.2d 880, 885–87 (S.D.Cal.2004); *Admiral Ins. Co. v. Briggs*, 264 F.Supp.2d 460 (N.D.Tex.2003) (citation omitted) ("an exclusionary clause providing that no coverage exists for claims 'based upon, arising out of, directly or indirectly resulting from or in consequence of, or *in any way involving* any oral or written contract or agreement' did not exclude claims for misrepresentation.").

The Court finds the reasoning in these cases to be persuasive and applicable to the facts of this coverage dispute. The Court has sorted through the extensive evidence, both pre-trial and what the parties presented to the jury to support or oppose the three separate counts.[6] Some

---

**6.** Federal disputed many of the paragraphs in TranSched's statement of facts, arguing that

of that evidence related directly to the language and terms of the APA [7] and other evidence shows that those misrepresentations were *not* based on Versyss's liability under the APA.

First, the evidence presented at trial is necessarily driven by the documents exchanged and deposition testimony taken during discovery. It is undisputed that the parties focused much of their discovery in the Underlying Suit on that period preceding the drafting and execution of the APA. Katherine Perrelli, Versyss' counsel affirmed that "[c]onservatively, approximately eighty-five percent (85%) of the more than one hundred thousand pages of documents that were produced in discovery (and likely much more than that) related to the plaintiff's due diligence efforts and the pre-February 1, 2005 time period." (ECF No. 33 at ¶¶ 30, 31). Additionally, Versyss' counsel admitted in the Underlying Suit that "[n]early all, if not all, of the discovery that related to the time period prior to the execution of the APA, February 1, 2005, was irrelevant to the breach of contract issues that arose out of the representations and warranties in the APA ... [and were] only relevant to the plaintiff's intentional misrepresentation claim." (*Id.* at ¶ 32). So, the evidence that the jury based its verdict on was primarily from communications occurring *before* the APA was in play. TranSched's complaint in the

Underlying Suit supports this, alleging that the misrepresentation claim was rooted in the pre-APA misrepresentations that were independent of the contract. (*See generally* ECF No. 34–8 at ¶¶ 15–67).

Second, the jury heard evidence concerning communications between Sheryl Miller and TranSched during the due diligence period. At trial, TranSched presented evidence that Ms. Miller gave TranSched a project plan that misrepresented the time line for Titan's completion and then lied and concealed information concerning Titan's progress before the APA was executed. (ECF No. 33 at ¶¶ 33–35, 38). The jury also heard from other witnesses that her project plan's three month beta testing timeline was unrealistic because very little code had been written as of the transaction closing date. (*Id.* at ¶¶ 34–36). Ms. Miller testified that she knew that some Titan customers were unhappy and planned to stop using Titan software. (*Id.* at ¶ 38).

Finally, though not as persuasive as the evidence the jury heard at trial on intentional misrepresentation claim, Versyss counsel's concessions about the origination of that claim and the way TranSched presented its evidence in terms of "breaches" supports the Court's conclusion that the jury found Versyss liable on the independent tort of intentional misrepresentation,

---

those paragraphs contain facts that were disputed through contradictory testimony at trial so they cannot now be undisputed. Nevertheless, TranSched prevailed on *all* of its claims at that trial where the jury is presumed to have judged the witnesses' credibility and resolved all of the relevant factual issues in its favor in reaching a verdict. Therefore, while Federal may not agree with those facts, the jury considered them and the Court must consider them in making a coverage determination in this case.

7. In its statement of facts, Federal mainly focuses on trial testimony concerning TranSched's breach of contract claim in the Underlying Suit, choosing to direct the Court's focus there because it supports its argument that the jury's verdict on the intentional misrepresentation claim arose from the contract and therefore is excluded from coverage. (*See* ECF No. 31–2). This testimony, however, does not condemn TranSched's argument that the contract exclusion does not apply because it would be expected in light of the fact that TranSched did bring a breach of contract claim as well.

which did not arise out of the APA. (ECF No. 42 at ¶¶ 43; 48–49).

The contract exclusion in the Federal policy is limited to actual liability arising under the contract. The Court cannot (nor can the parties) determine what evidence the jury focused on in rendering its verdict in TranSched's favor on the intentional misrepresentation claim, but it is reasonable to conclude that the verdict was based on the totality of the record. The evidence at trial sufficiently supports TranSched's assertion that the intentional misrepresentation claim did not arise out of the contract, but concerned only pre-transaction conduct. The APA was not a cause of the intentional misrepresentation claim, it was the result of it, and any tortious conduct is not covered under the exclusion because it preceded the APA and was independent of the terms of the contract itself.

Therefore, on the undisputed facts of this case, the Court finds that Federal has not met its burden of proving the applicability of the contract exclusion, and thus, the contract exclusion does not bar coverage for those damages.[8]

## 2. The Fraud Exclusion

 The parties also dispute whether, as a matter of law, the Policy's fraud exclusion bars coverage. Federal argues that the Policy does not cover the jury's damage award because it excludes coverage "(10) based upon, arising from, or in consequence of any deliberately fraudulent act or omission or any willful violation of any statute or regulation by such Insured, if a final and non-appealable judgment or adjudication adverse to such Insured establishes such a deliberately fraudulent act

or omission or willful violation." (ECF No. 31–2 at ¶ 41). Because the intentional misrepresentation claim that TranSched proved against Versyss included evidence of deliberately fraudulent conduct, Federal argues that coverage is excluded.

TranSched argues that the Insured's state of mind can be deciphered by looking at the "Severability of Exclusions" clause, which relates to the fraud exclusion and provides:

> With respect to Exclusions (A)(10) [fraud exclusion] and (A)(11) in this Coverage Section: * * * (2) only facts pertaining to and knowledge possessed by any past, present or future Chief Financial Officer, President, Chief Executive Officer or Chairperson of any Insured Organization shall be imputed to any Insured Organization to determine if coverage is available.

(ECF No. 33 at ¶ 16).[9] According to this clause, Versyss's state of mind consists solely of "facts pertaining to and knowledge possessed by" Versyss's CFO, President, CEO or Chairperson. Because the fraudulent acts and/or omissions that the jury heard about at trial were not perpetrated by any employees in those enumerated roles, but rather by vice presidents, TranSched argues that they cannot be imputed to Versyss for the purposes of applying the fraud exclusion; therefore, the exclusion does not apply.

The Court evinced its support of TranSched's interpretation at the motion to dismiss stage where it reasoned that:

> Versyss is subject to the fraud exclusion only if "such Insureds" committed a deliberately fraudulent act. By using the

---

8. In light of this ruling, there is no need to address TranSched's argument that an exception to the limited contract exclusion controls.

9. The presence of the severability provision means that the wrongful acts or misstatements of one insured will not void the contract or otherwise adversely affect coverage it provides for other insureds.

term "such Insured," the fraud exclusion is focused upon deliberate fraud committed by the particular Insured that is seeking coverage, in this case, Versyss. However, as a corporation, Versyss does not commit deliberate fraud on its own; it acts through its employees. The jury in Delaware considered the acts of both Versyss and TranSched employees in rendering its verdict in favor of TranSched's claims. The Policy provides guidance in determining which key Versyss employees' conduct can be imputed to Versyss when attempting to discern coverage.

*TranSched,* 958 F.Supp.2d at 337. That guidance comes from the "Severability of Exclusions" clause. Referring to the language of that clause, the Court found that the Policy provides that misconduct of certain Versyss' executives—the CFO, President, CEO or Chairperson—may be imputed to Versyss to determine whether there is coverage under the fraud exclusion. *Id.*

Federal argues now that it does not intend to "impute" any employees' conduct to Versyss and that the Court must focus on Versyss' conduct. If the Court were to adopt Federal's interpretation, first, it would have to ignore the Severability of Exclusions clause and second, it would have to find that any misleading representation or omission by any employee of an Insured Organization would trigger the fraud exclusion. The fraud exclusion, without the severability clause, could work an inequitable result when one considers how many employees a company has and the fact that the exclusion as written makes the company responsible for all of its employees' misconduct without providing any coverage. In light of that inequity, the Policy provides the "Severability of

Exclusions" clause in order to prevent an innocent insured, Versyss, from losing coverage resulting from the conduct of any employee, *except* for the conduct of the high-level enumerated positions. In this case, the severability clause enumerates which employees' conduct can be imputed to Versyss—i.e. which employees' misconduct Versyss must take responsibility for in the form of excluded coverage. When examining the language of the severability clause, this is pellucid because it lists high-ranking executives who have a high level of knowledge and accountability within the company and who have the authority to direct its plans and future.

Now that the parties are at the summary judgment stage, the Court must determine from the developed record whether the fraud exclusion and severability of exclusions clause apply here. At trial, the jury heard evidence that Sheryl Miller misrepresented the viability, capabilities, and readiness of the software to TranSched before the parties drafted and executed the APA. (ECF No. 33 at ¶¶ 33–36, 38). It is undisputed that "[n]either Ms. Miller nor Mr. Miller was the CFO, President, CEO, or Chairperson of any of the Versyss Entities during the Transaction's negotiation and due diligence period." (*Id.* at ¶ 23). The jury did hear evidence about Mr. Holbrook, Versyss' President (and an enumerated employee under the severability clause) and his involvement with the Titan software deal, although he did not testify live. (*See* ECF No. 31–2 at ¶ 24; ECF No. 33 at ¶ 29; ECF No. 42 at ¶¶ 51–52).[10] However, the jury also heard Mr. Holbrook testify that Sheryl Miller "knew the most—she was intimately aware of every piece of that business, so she was the most obvious

---

10. Mr. Holbrook was sued in the Underlying Suit, but the court dismissed all claims against him before trial, including a negligent

misrepresentation claim. (ECF No. 33 at ¶¶ 24–26).

person to do that [be the point person on the TranSched negotiation]." (ECF No. 42 at ¶ 51). And while it bears repeating that neither the Court nor the parties can determine exactly what evidence the jury focused on in finding in TranSched's favor on the intentional misrepresentation claim, it is clear that the case mainly focused on the vice presidents' roles in driving the transaction. Because their conduct does not bind Versyss on the terms of the exclusion, the fraud exclusion does not apply to this case.

## C. ALLOCATION OF THE DAMAGES VERDICT

 The verdict form was not structured in a way for the jury in the Underlying Suit to allocate so it awarded one total damages amount in its verdict without specifically allocating a dollar value to each claim. Therefore, neither the parties nor this Court knows how much of the $500,000 verdict the jury intended to award on the intentional misrepresentation claim as opposed to the two uncovered claims. In its motion, Federal argues that, even if TranSched is entitled to indemnification under the Policy for the intentional misrepresentation verdict, it cannot recover its damages as a matter of law because it failed to ask the jury to allocate the damages between the claims at trial. Therefore, Federal argues that it is inequitable for it to pay the entire damages verdict when two of the claims are indisputably excluded by the Policy. TranSched counters that it does not have the burden to prove which portion of the total verdict was in satisfaction of its intentional misrepresentation claim and nevertheless, the evidence at trial established that the damages were indivisible to each or all of the counts.

 The first question the Court must answer is who bore the burden of ensuring that the jury allocated the damage award between the claims? TranSched says that the insurance company does and, not surprisingly, Federal points the finger at TranSched. An insured has the burden to allocate, but that burden "arises only after it has been demonstrated that a portion of the verdict or settlement is covered by the policy or policies and a portion is not." *Cont'l Cas. Co. v. Canadian Universal Ins. Co.*, 924 F.2d 370, 376 (1st Cir.1991). But, where a suit contains the potential for both covered and uncovered claims, the insurer has a duty to inform its insured that allocation in the form of a special verdict is available and potentially advisable. *Duke v. Hoch*, 468 F.2d 973, 979–980 (5th Cir.1972). In the Underlying Suit, Federal was Versyss' insurer, Versyss was the insured, and there is no evidence that Federal discussed allocating through a special verdict form. What we do know is that Versyss did not propose an allocated verdict form. (ECF No. 42 at ¶ 57). Versyss' failure to do so, under the representation and advice from counsel paid by Federal, cannot be permitted to impose an unreasonable—in fact, an impossible—burden on TranSched to allocate the damages award post-verdict. Especially since there is no dispute between the parties that TranSched proposed a special verdict form that asked the jury to allocate damages to each claim. (*Id.* at ¶ 56).[11]

The Fifth Circuit in *Duke* highlighted this untenable burden on a third party. That court noted that it is not necessarily in the insurance company's best interest to

---

11. The reasons are not clear from the record, but the Delaware court chose not to give TranSched's proposed form to the jury.

have an allocated verdict where there are covered and uncovered claims, especially in light of its position that it is the insured's burden to allocate. *Duke,* 468 F.2d at 978–979. If there is no allocation, the company then argues that the insured failed in its burden and that it would be unfair for it to have to pay any damages when the policy did not cover certain claims. *Id.* This conflicting interest caused that court to place a duty on the insurance company to inform its insured that it should consider a special verdict form asking the jury to allocate the damages.

The Court finds that TranSched should not be penalized because it was not successful in persuading the Delaware court to use its special verdict form on which the jury would have apportioned its damages. Again, the record does not show that Federal failed in its duty to inform Versyss, but Federal also does not argue to this Court that it did so inform Versyss. Federal, as the insurer who defended Versyss at trial, cannot be rewarded for advocating a position, by action or silence, which places an unreasonable burden on TranSched. Therefore, TranSched is relieved of any burden to request allocation. *Id.* at 979–980.

The next question is, in light of the Court's determination that TranSched has not forfeited the damages award, how should the jury's $500,000 damages award be apportioned? Ironically, the case law tells us that apportionment is a question of fact to be decided at a trial, not on a summary judgment motion. *Cont'l Cas. Co.,* 924 F.2d at 378. However, there has been much litigation in this case and the Court certainly does not believe more is necessary, especially since the evidence at an apportionment trial about what quantity of the $500,000 belongs to the tort claim will be from the Underlying Suit at which

TranSched already prevailed. That very uneconomical concept of relitigating facts in multiple trials is the reason why apportionment of either a settlement or verdict "between covered and non-covered claims is typically resolved through negotiation and private agreement, rather than litigation, as litigation costs can be astronomical." *In re Feature Realty Litig.,* 634 F.Supp.2d 1163, 1171–72 (E.D.Wash.2007). Therefore, the Court orders the parties to mediation of the allocation amount. They can use the services of the Magistrate Judge assigned to this case, the Federal Court mediator, or a private mediator of their choosing.

### D. COUNT II—THE "REJECTED SETTLEMENT OFFER" STATUTE

█ TranSched argues that it is entitled to relief under R.I. Gen. Laws § 27–7–2.2, the "rejected settlement offer" statute, because it made a pre-trial demand of Federal within the Policy limits and Federal did not accept it. That statute would award TranSched all interest on the judgment, even if the total exceeds the available policy limits. *DeMarco v. Travelers Ins. Co.,* 26 A.3d 585, 617 (R.I.2011).

Federal argues that § 27–7–2.2 only applies domestically, and because the Underlying Suit was litigated in Delaware and subject to Delaware laws regarding settlement offers made during litigation, the statute does not apply to this coverage dispute litigation. TranSched counters that Federal has a strong connection to Rhode Island, including its consent to this Rhode Island lawsuit and their agreement to apply Rhode Island law, which would include this rejected settlement statute.

█ The purpose of a rejected settlement statute is to encourage pre-trial settlement and reflects "[a]n insurance company's fiduciary obligations . . . to consider

seriously a plaintiff's reasonable offer to settle within the policy limits." *Asermely v. Allstate Ins. Co.*, 728 A.2d 461, 464 (R.I.1999). This Court's look at this statute's effect in *Armacost v. Amica Mut. Ins. Co.*, 821 F.Supp. 75 (D.R.I.1993) *aff'd*, 11 F.3d 267 (1st Cir.1993) is instructive. In that case, the plaintiff was a Massachusetts resident who got into a car accident in Newport with a driver from New York who had car insurance through Arnica, a Rhode Island company. The parties litigated the suit in federal court in Rhode Island pursuant to the court's diversity jurisdiction. Arnica argued that § 27–7–2.2 was unconstitutional because it purported to regulate insurance contracts made outside of Rhode Island. *Id.* at 81. The court disagreed, finding that " § 27–7–2.2 does not purport to regulate contracts of insurance in any way. *It simply governs the behavior of litigants in Rhode Island courts,* in an effort to enhance the prospects of expeditious and reasonable settlement in cases where there is liability insurance." *Id.* (emphasis added). In other words, the court determined that the statute did not deal substantively with the insurance contracts, but focused on the conduct of parties as insurance contract issues played out in Rhode Island courts.

While TranSched did file this suit in Rhode Island and the Court is deciding coverage under the law of this state, the Court disagrees that the rejected settlement statute applies under that same rubric. The Underlying Suit was litigated from Complaint to trial in Delaware, not in Rhode Island. It is clear from the record that settlement discussions took place in the Delaware litigation and that the trial court in Delaware considered the parties' pre-trial negotiations and pre-judgment interest and awarded $170,268.75 for the latter. If this Court were to apply Rhode Island's rejected settlement statute to this lawsuit at the coverage dispute stage,

TranSched would get two bites at the pre-judgment interest apple—it is possible that it could get double the interest in that scenario. That is an unjust result in any court.

Moreover, the purpose of this suit is to determine whether TranSched is entitled to payment from Federal under Versyss' insurance policy. The reach of the Policy's coverage has nothing to do with whether TranSched made a settlement demand, whether Versyss rejected that demand, or whether Versyss' insurer now must live with the consequences of that rejection. The plain language of § 27–7–2.2 cannot be read to apply to subsequent insurance coverage disputes as it specifically refers to the parties' pre-judgment positions; the posture of this litigation is obviously post-judgment. Therefore, Rhode Island's "rejected settlement offer" statute does not apply here.

## IV. CONCLUSION

For the reasons stated above, TranSched's Motion for Summary Judgment on Count I is GRANTED and on Count II is DENIED. For the same reasons, Federal's Motion for Summary Judgment on Count I is DENIED and is GRANTED on Count II. The parties are ordered to mediation to determine the proper damages verdict allocation. The Court lifts the stay on TranSched's claims for statutory and common-law bad faith in its Counts III and IV if it chooses to continue to pursue such action.

IT IS SO ORDERED.